## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **LAUREN KENT,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:21-cv-412** |
| | § | |
| **COLLIN COUNTY, TEXAS,** | § | |
| **WELLPATH, LLC f/k/a/** | § | |
| **SOUTHWEST CORRECTIONS** | § | |
| **MEDICAL GROUP, INC.,** | § | |
| **SOUTHWEST CORRECTIONS** | § | |
| **MEDICAL GROUP, INC.,** | § | |
| **JELIL ATIBA,** | § | |
| **In his individual capacity,** | § | |
| **LATORI ABII,** | § | |
| **In her individual capacity,** | § | |
| **MICHELLE POUNDERS,** | § | |
| **In her individual capacity,** | § | |
| **JULIA MCBRIDE,** | § | |
| **In her individual capacity,** | § | |
| *Defendants*. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF

# TABLE OF CONTENTS

Table of Authorities .............................................................................................. 4

SUMMARY ............................................................................................................. 8

I.   Parties ............................................................................................................. 9

II.  Jurisdiction and Venue .............................................................................. 11

III. Facts and Allegations ................................................................................. 11

    WELLPATH/SWCMG Avoids Off-Site Medical Care to Reduce Costs for Collin County ................................................................................................................... 13

    Wellpath Took Over After Merger of CMG and CCS ................................... 15

    Wellpath Profits by Refusing to Provide Medical Care ................................ 16

    Incentives Not to Transport Inmates to Off Site Medical Providers............................ 18

    Collin County's Goal to Save Money on Off-Site Medical Care .................................... 19

    WELLPATH/SWCMG Promised to Save Collin County Money on Off-Site Medical Care.................................................................................................................... 21

    Collin County Accepted WELLPATH/SWCMG Bid Based Off Promise to Keep Costs Low .................................................................................................................... 23

    WELLPATH/SWCMG's Incentives to Keep Collin County's Costs Low...................... 25

    Wellpath Took Over Medical Services for Southwest Correctional Medical Group at the Collin County Jail .......................................................................................... 31

    Wellpath and the Companies it has Taken Over have a History Deliberate Indifference to Pregnant Inmates........................................................................................... 32

    Collin County Adopted WELLPATH/SWCMG's Policies and Practices When Collin County Chose to Contract with WELLPATH/SWCMG to Provide Medical Care in the Jail ...................................................................................................................... 35

    WELLPATH/SWCMG's and Collin County Policy Incentivized Refusing Off-Site Medical Care for Indigent Inmates ................................................................ 37

    Shocking Deliberate Indifference Leads to the Death of Ms. Kent's Child ................... 38

    Ms. Kent Alerted Jail Staff That She was Pregnant When She Entered the Collin County Jail........................................................................................................ 39

    WELLPATH/SWCMG's Employees and the County's Employees Refused to Treat Ms. Kent ................................................................................................................... 40

    Ms. Kent Lost Baby Dakota Due to the Deliberate Indifference to Her Obvious Medical Needs .................................................................................................................. 58

IV. Causes of Action......................................................................................... 65

    COUNT I - DELIBERATE INDIFFERENCE TO MEDICAL NEEDS ......................... 65

        Defendant Atiba was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. .................................................... 67

Defendant Atiba actually drew that inference. .................................................... 67
Defendant Pounders was aware of facts from which the inference could be drawn
that a substantial risk of serious harm existed. ................................................. 67
Defendant Pounders actually drew that inference. ............................................ 68
Defendant Abii was aware of facts from which the inference could be drawn that a
substantial risk of serious harm existed. ............................................................ 68
Defendant Abii actually drew that inference. ..................................................... 69
Defendant McBride was aware of facts from which the inference could be drawn that
a substantial risk of serious harm existed. ........................................................ 69
Defendant McBride actually drew that inference. .............................................. 70

COUNT II - FAILURE TO SUPERVISE ....................................................... 70

COUNT III - PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE ........... 72
POLICYMAKER ............................................................................. 75
Collin County ................................................................................. 76
WELLPATH/SWCMG ..................................................................... 78
Policy, Custom, and Practice ........................................................... 80
Which was Moving Force of Constitutional Violations ...................... 80
Policy, Custom, Practice, and Culture of ......................................... 81
Reducing Costs by Denying Necessary Medical Care ....................... 81

V.   PUNITIVE DAMAGES ....................................................................... 87

VI.   DAMAGES ........................................................................................ 87

VII.  ATTORNEY'S FEES ........................................................................... 88

VIII. JURY REQUEST ................................................................................ 88

PRAYER ........................................................................................................ 88

## **Table of Authorities**

**CASES**

*Alderson v. Concordia Par. Corr. Facility,*
848 F.3d 415, 422 n.8. (5th Cir. 2017) .......................................................................... 66

*Ancata v. Prison Health Servs., Inc.,*
769 F.2d 700, 705 (11th Cir. 1985) ............................................................................... 75

*City of Oklahoma City v. Tuttle,*
471 U.S. 808, 823 (1985) ..................................................................................... 15, 74, 81

*Domino v. Tex. Dep't of Criminal Justice,*
239 F.3d 752, 755 (5th Cir. 2001) ........................................................................ passim

*Dubbs v. Head Start, Inc.,*
336 F.3d 1194, 1216 (10th Cir. 2003) ........................................................................... 73

*Dyer v. Houston,*
964 F.3d 374, 380 (5th Cir. 2020) ........................................................................ passim

*Easter v. Powell,*
467 F.3d 459, 463 (5th Cir. 2006) ........................................................................ passim

*Est. of Henson v. Wichita Cty., Tex.,*
795 F.3d 456, 463–64 (5th Cir. 2015) ........................................................................... 66

*Farmer v. Brennan,*
511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994) ................................ 66

*Fielder v. Bosshard,*
590 F.2d 105, 108 (5th Cir. 1979) .................................................................................. 7

*Galvan v. Calhoun Cty.,*
719 F. App'x 372 (5th Cir. 2018) ................................................................................... 66

*Gobert v. Caldwell,*
463 F.3d 339, 345 (5th Cir. 2006) ........................................................................ passim

*Goodman v. Harris Cty.,*
571 F.3d 388, 395 (5th Cir. 2009) ........................................................................... 71, 72

*Hampton Co. Nat'l Sur., LLC v. Tunica Cty.,*
543 F.3d 221, 224 (5th Cir. 2008) ................................................................................. 73

*Hare v. City of Corinth, Miss.,*
74 F.3d 633, 645 (5th Cir. 1996) ......................................................................... 9, 74, 75

*Harris v. Hegmann*,
   198 F.3d 153, 159–60 (5th Cir. 1999)............................................................................66

*Hicks–Fields v. Harris Cty.*,
   860 F.3d 803, 808 (5th Cir. 2017).......................................................................... 74, 78

*James v. Harris Cty*,
   577 F.3d 612, 617 (5th Cir. 2009).................................................................................76

*Johnson v. Treen*,
   759 F.2d 1236, 1238 (5th Cir. 1985)......................................................................passim

*King ex rel. Estate of King v. Kramer*,
   680 F.3d 1013, 1020 (7th Cir. 2012) ............................................................................75

*Lawson v. Dallas Cty.*,
   286 F.3d 257 (5th Cir. 2002) ........................................................................................75

*Louis v. Praprotnik*,
   485 U.S. 112, 126 (1988)................................................................................75, 78, 80

*M. D. by Stukenberg v. Abbott*,
   907 F.3d 237, 255 (5th Cir. 2018) ....................................................................80, 81, 86

*Malone v. City of Fort Worth*,
   297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) ..................................................................74

*Monell v. Department of Social Services of City of New York*,
   436 U.S. 658, 691–94 (1978) .......................................................................................73

*Pena v. City of Rio Grande City*,
   879 F.3d 613, 623 (5th Cir. 2018) ................................................................................74

*Piotrowski v. City of Houston*,
   237 F.3d 567, 578 (5th Cir. 2001) ....................................................................73, 80, 86

*Sanchez v. Young Cty., Texas*,
   866 F.3d 274, 280 (5th Cir. 2017)............................................................................ 74, 75

*Smith v. Brenoettsy*,
   158 F.3d 908, 911–12 (5th Cir.1998)........................................................................71, 72

*Thompson v. Upshur Cty.*,
   245 F.3d 447, 458-59 (5th Cir. 2001) ...........................................................................65

*Wabuyabo v. Correct Care Sols.*,
   723 F. App'x 642, 643 (10th Cir. 2018)..........................................................................73

*Webster v. City of Houston*,
    735 F.2d 838, 841 (5th Cir.1984) ..................................................................... 74

*Williams v. Kaufman County*,
    352 F.3d 994, 1013 (2003) ............................................................................... 76

*Zarnow v. City of Wichita Falls, Tex.*,
    614 F.3d 161, 166 (5th Cir. 2010) ............................................................. 73, 74

**OTHER AUTHORITIES**

https://www.cnn.com/2019/05/07/health/jail-births-wellpath-ccs-invs/index.html, ... 9

https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/ ......... 16, 17, 18

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, LAUREN KENT, Plaintiff, complaining of COLLIN COUNTY, TEXAS, SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC., WELLPATH, LLC f/k/a/ SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.,[1] JELIL ATIBA, in his individual capacity, LATORI ABII, in her individual capacity, MICHELLE POUNDERS, in her individual capacity, and JULIA MCBRIDE, in her individual capacity, and for causes of action will respectfully show unto the Court as follows:

"There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help."

*Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979).

---

[1] Southwest Correctional Medical Group, Inc., which was contracted to provide medical care at the Collin County Jail, rebranded as "Wellpath" prior to the incident that makes the basis of this lawsuit. Both are named here, in an abundance of caution, but will be referred to as a singular Defendant or simply "WELLPATH/SWCMG" or "Medical Contractor" in this Complaint.

## SUMMARY

The Defendants in this case crossed the line from misfeasance to conscious cruelty when they repeatedly refused to provide prenatal care to Lauren Kent despite her repeated and documented pleas for help. Ms. Kent was four and a half months pregnant and tearfully begging for help due to her abdominal pain, abdominal cramping, and vaginal bleeding which lasted over a week, as it rapidly and progressively intensified. The Defendants' cruel refusal to provide obviously necessary medical care directly caused the tragic and preventable death of Ms. Kent's unborn child, Dakota Lee.

In response, to her obvious need for help that even an untrained child would understand needed medical attention, Defendants Jelil Atiba, Latori Abii, Michelle Pounders, and Julia McBride callously and shockingly responded by telling Ms. Kent she would receive no medical care unless she saturated two full pads with blood. The thought of a pregnant woman saturating two pads with blood is horrifying, but in the Collin County jail, it is what their protocols required in order to provide emergency medical care.

Defendants Atiba, Abii, Pounders, and McBride were acting pursuant to the Cost Containment Program, a policy at the Collin County Jail to reduce expenses by avoiding and refusing to transfer inmates who need emergency medical care to outside medical providers. Defendant Southwest Correctional Medical Group, Inc., which was purchased by Wellpath, LLC, prior to the time when Ms. Kent was in the Collin County Jail begging for medical care, proposed the Cost Containment Program in its bid to land the contract to provide medical services at the Collin County Jail. As a result of this promise to reduce costs, Collin County chose Southwest Correctional Medical Group, Inc. as the Jail's healthcare provider. Wellpath continued this unconstitutional cost saving policy which is outlined below in this lawsuit.

Unsurprisingly, Wellpath has a history of miscarriages and stillbirths in the detention facilities it contracts with to provide medical services. In the years leading up to their maltreatment of Ms. Kent, Wellpath was at the center of lawsuits involving at least six different facilities with allegations that pregnant women had been subjected to inhumane and dangerous conditions and treatment that in some cases led to miscarriages and infant deaths.[2] The common denominator in these cases – Wellpath's commitment to saving money over lives.

But for the policies in the Collin County Jail to reduce costs to the detriment of the health and safety of inmates needing emergency medical care, Ms. Kent would have been taken to a hospital as soon as the pregnant, soon to be mother complained of abdominal pain and vaginal bleeding.

Ms. Kent now sues these Defendants for violating her constitutional rights. The question is whether these officials breached their constitutional duty to tend to the basic human needs of persons in their charge. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). In this case, the answer is a resounding, Yes.

## I.
## Parties

1.     Plaintiff Lauren Kent is an individual residing in Collin County, Texas.

2.     Defendant Collin County, Texas is a political subdivision of the State of Texas located in the Eastern District of Texas. Collin County, Texas can be served through its County Judge, Chris Hill, at 2300 Bloomdale Rd., Suite 4192, McKinney, TX 75071, or wherever he may be found.

---

[2] Dangerous jail births, miscarriages, and stillborn babies blamed on the same billion dollar company, https://www.cnn.com/2019/05/07/health/jail-births-wellpath-ccs-invs/index.html, last accessed March 17, 2021.

3.     Defendant Southwest Correctional Medical Group, Inc., is a is a third-party medical company providing medical services for the Collin County Jail. This Court may exercise personal jurisdiction over Southwest Correctional Medical Group, Inc. because its employees at the Collin County Jail committed acts and omissions within the scope of their employment that gave rise to this cause of action. Southwest Correctional Medical Group, Inc. may be served at its corporate headquarters located at 1283 Murfreesboro Pike, Nashville, TN 37217.

4.     Defendant Wellpath, LLC, f/k/a Southwest Correctional Medical Group, Inc., is a Delaware corporation with its headquarters and principal place of business located in Tennessee. This Court may exercise personal jurisdiction over Wellpath because its employees at the Collin County Jail committed acts and omissions within the scope of their employment that gave rise to this cause of action. Wellpath may be served with process through their registered agent Corporate Creations Network, Inc., 2425 W. Loop South #200, Houston, TX 77027.

5.     Defendant Jelil Atiba is an individual residing in Collin County, Texas, and may be served at his place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever he may be found. Defendant Atiba is being sued in his individual capacity.

6.     Defendant Latori Abii is an individual residing in Collin County, Texas, and may be served at her place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever she may be found. Defendant Abii is being sued in her individual capacity.

7.     Defendant Michelle Pounders is an individual residing in Collin County, Texas, and may be served at her place of employment at the Collin County Sheriff's Office

located at 4300 Community Ave, McKinney, TX 75071 or wherever she may be found. Defendant Pounders is being sued in her individual capacity.

8.     Defendant Julia Mcbride is an individual residing in Collin County, Texas, and may be served at her place of employment at the Collin County Sheriff's Office located at 4300 Community Ave, McKinney, TX 75071 or wherever she may be found. Defendant McBride is being sued in her individual capacity.

## II.
## Jurisdiction and Venue

9.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

10.     Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Eastern District of Texas, and all or a substantial part of the cause of action accrued in the Eastern District of Texas.

## III.
## Facts and Allegations

11.     At all times relevant to this lawsuit, Plaintiff Lauren Kent was being held as a pre-trial detainee in the Collin County Adult Detention Facility ("Collin County Jail").

12.     At all times relevant to the subject matter of this litigation, Defendant Collin County, Texas ("Collin County" or "County") operated the Collin County Jail where Ms. Kent was detained.

13.     Prior to the events that form the basis of this lawsuit, the private contractor Wellpath, the largest correctional health care provider in the country, formed as the result of a merger between a company called Correct Care Solutions, or CCS, and a smaller competitor, Correctional Medical Group Companies (CGMC).

14. Southwest Corrections Medical roup, Inc. was part of CGMC prior to the merger which created Wellpath.

15. At all times relevant to the subject matter of this litigation, Defendant Wellpath, LLC, f/k/a Southwest Correctional Medical Group, Inc. acted under color of state law by providing medical services and care at the Collin County Jail pursuant to an agreement (or agreements) with Collin County.

16. At all times relevant to the subject matter of this litigation, Defendant Southwest Correctional Medical Group, Inc. acted under color of state law by providing medical services and care at the Collin County Jail pursuant to an agreement (or agreements) with Collin County.

17. Due to the

18. At all times relevant to the subject matter of this litigation, WELLPATH/SWCMG was willfully a participant in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates.

19. At all times relevant to the subject matter of this litigation, Defendant Jalil Atiba (hereinafter referred to as "Defendant Atiba") was an employee of WELLPATH/SWCMG, who was following practices, policies, customs, and training of WELLPATH/SWCMG.

20. At all times relevant to the subject matter of this litigation, Defendant LaTori Abii (hereinafter referred to as "Defendant Abii") was an employee of WELLPATH/SWCMG, who was following practices, policies, customs, and training of WELLPATH/SWCMG.

21.     At all times relevant to the subject matter of this litigation, Defendant Michelle Pounders (hereinafter referred to as "Defendant Pounders") was an employee of WELLPATH/SWCMG, who was following practices, policies, customs, and training of WELLPATH/SWCMG.

22.     At all times relevant to the subject matter of this litigation, Defendant Julia McBride (hereinafter referred to as "Defendant McBride") was an employee of WELLPATH/SWCMG, who was following practices, policies, customs, and training of WELLPATH/SWCMG.

23.     People incarcerated within the Collin County Jail are dependent upon the Collin County Jail and WELLPATH/SWCMG, and their employees to provide them with medical care.

24.     Prisoners are not free to seek their own care, even if they can pay for it.

### WELLPATH/SWCMG Avoids Off-Site Medical Care to Reduce Costs for Collin County

25.     As part of WELLPATH/SWCMG's Proposal to Provide Inmate Health Care at the Collin County Detention Facilities ("Proposal"), WELLPATH/SWCMG promised Collin County that they would utilize what they call a "Cost Containment Program."

26.     WELLPATH/SWCMG explained in the Proposal that WELLPATH/SWCMG applies cost containment principles to help control and reduce off-site costs.

27.     WELLPATH/SWCMG further explained in the Proposal that they would provide "Proactive Onsite Care Optimization."

28.     WELLPATH/SWCMG explained this Proactive Onsite Care Optimization in the Proposal by explaining that "[b]y optimizing the delivery of medical care onsite, we

significantly reduce off-site transports and offsite care requirements. This not only reduces your cost of off-site care, but can reduce significantly the cost and burden on your custody staff. As noted earlier, we recently completed a study in a county with an inmate population similar to Collin County, comparing off-site transports, before and after we took over services from one of our large competitors. This study revealed a *27% reduction* in off-site transports, saving an estimated 2,700 custody staff hours (and more than $140,000) each year for transporting inmates."

29.     Collin County chose WELLPATH/SWCMG to provide medical care at the Collin County Jail due to this promise to reduce off-site transports, which is what Ms. Kent required to adequately address her medical issues.

30.     WELLPATH/SWCMG's practice was to refuse to transport inmates off site for medical care to reduce costs and to fulfill the promise in their Proposal, which helped win them the contract with Collin County.

31.     WELLPATH/SWCMG's policy, which is found in the "Facility Medical charges policy" signed by Ms. Kent on 5/30/2019 in front of interviewer, LVN Emily Burris, states:

> True medical emergencies as determined by the medical staff. Note that emergency medical care is defined as "life or limb threatening illness or injury."

32.     WELLPATH/SWCMG had a name for its practice of refusing to transport inmates off site for medical care: Cost Containment Program. Further, WELLPATH/SWCMG determines what qualified as a medical emergency necessitating transport of the inmate to off-site medical care, and WELLPATH/SWCMG's policy only defines emergency medical care as "life or limb threatening illness or injury." Therefore,

if the WELLPATH/SWCMG staff does not determine that the inmate is about to lose their life or limb, then it does not qualify as an emergency medical care situation under WELLPATH/SWCMG's policy and transport to offsite medical care will be denied, pursuant to the Cost Containment Program.

33.     In an email from then Collin County Sheriff Terry Box on March 24, 2016 at 1:12 PM, Jail Administrator Charles Adams was quoted as stating that their "Offsite costs have been reduced."

34.     This Cost Containment Program was an unconstitutional practice that prevented Ms. Kent from receiving the medical care she obviously needed, resulting in the death of her unborn child.

35.     In *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985), the Supreme Court described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." The decision by Collin County to outsource the medical care of detainees under a contract with WELLPATH/SWCMG was exactly that.

## Wellpath Took Over After Merger of CMG and CCS

36.     On November 1, 2018, Greg Roberts, the Collin County Health Services Administrator, sent an email to Collin County Sheriff Jim Skinner, and seventeen other Collin County administrators named in the screenshot of the email below. This email was to share information about Wellpath, the merged CMG and CCS company taking over.

From: Greg Roberts <greg.roberts@cmgcos.com>
Sent: Thursday, November 1, 2018 4:30 PM
To: James Skinner <sheriff.skinner@co.collin.tx.us>; Terry McCraw <tmccraw@co.collin.tx.us>; Bryce Thompson <bthompson@co.collin.tx.us>; Gerard Klahr <gklahr@co.collin.tx.us>; David Barnett <dbarnett@co.collin.tx.us>; Kelley Stone <kstone@co.collin.tx.us>; Matt Langan <mlangan@co.collin.tx.us>; Jimmy Moody <jmoody@co.collin.tx.us>; Michael Sepulvado <msepulvado@co.collin.tx.us>; Christopher Perepiczka <cperepiczka@co.collin.tx.us>; Chris Barnes <cbarnes@co.collin.tx.us>; Anne Sibley <asibley@co.collin.tx.us>; Hiram Lynn Hadnot <hhadnot@co.collin.tx.us>; Michael King <mking@co.collin.tx.us>; Alyse Ferguson <aferguson@co.collin.tx.us>; Candy Blair <cblair@co.collin.tx.us>; Candice Akins <cakins@co.collin.tx.us>; Michelle Charnoski <mcharnoski@co.collin.tx.us>
Subject: Wellpath, the new CCS+CMGC

Partners,

I wanted to share the attached brochure with each of you that has some information about Wellpath, the merged CMG and CCS company. I don't expect any significant changes in our functionality or the ability to deliver quality services to our facilities at Collin County. I remain committed to our partnership and to the successful delivery of quality Adult and Juvenile healthcare. Please always let me know how we can be better and thank you for your continued confidence and support.

Greg Roberts, RN, CCHP
Health Services Administrator
Wellpath, Your Correctional Healthcare Provider
Collin County Detention Facility
4300 Community Blvd
McKinney, TX 75071
972-547-5296 office
469-989-8371 mobile

37.     As can be seen in Greg Roberts' signature block, on November 1, 2018, Wellpath was the Correctional Healthcare Provider for the Collin County Detention Facility.

### **Wellpath Profits by Refusing to Provide Medical Care**

38.     The private contractor, Wellpath, is the largest correctional health care provider in the country -- the result of a recent merger between a company called Correct Care Solutions, or CCS, and a smaller competitor, Correctional Medical Group Companies (CGMC).

39.     The Supreme Court has ruled that providing health care to inmates is mandated by the United States Constitution.

40.     For Wellpath, this job brings in annual revenues of $1.5 billion through contracts to provide medical services.

41.     Wellpath has won government contracts that span more than 500 facilities in 34 states. It promises to provide better services than its competitors and, most importantly, to save agencies money while doing it.

42.     According to a CNN investigation, internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees and scathing correspondence from government clients show that amid a focus on **"cost containment"** and massive corporate growth, the company has provided substandard care that has led to deaths and other serious outcomes that could have been avoided. Please Help Me Before it is Too Late, by Blake Ellis and Melanie Hicken, CNN, Published June 25, 2019  https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/, last accessed May 21, 2021.

16

43.    In a deposition in a South Carolina lawsuit, a CCS medical director at Richland County's Alvin S. Glenn Detention Center, where employees waited days to send a badly injured inmate to the emergency room, said in 2014 that the company made it clear that employees who "run up the tab" would not be around very long. He said there was pressure on him from both the county and CCS to limit emergency room transfers because of the "severe expense" involved -- regardless of who had to foot the bill. *Id*.

44.    This effort to avoid the "severe expense" of transporting inmates to off-site medical care that occurred in South Carolina, was clearly occurring in Collin County, Texas when they refused to send Ms. Kent to the hospital.

45.    The U.S. Department of Justice took the rare step of declaring the medical program at a Virginia jail unconstitutional. It found that inmate requests at the Hampton Roads Regional Jail were ignored or otherwise not taken seriously, resulting in serious harm and death. *Id*. This is precisely what occurred with Ms. Kent in this case.

46.    A nurse at a jail in New York accused 36-year-old Rashod McNulty of faking his chest pain. He went into cardiac arrest and died within hours, and an officer wrote in a 2013 facility incident report that he "had to endure and watch him take his last breath because he was denied medical treatment by medical staff." A state investigation ultimately found his death "may have been prevented" if he had received adequate care. *Id*.

47.    The Texas Commission on Jail Standards was alarmed by what it found when investigating the 2014 death of inmate David Courtney, who had been held in the Montgomery County Jail. An email from the commission said that Courtney waited nearly two months to see a doctor despite multiple notes in his records about blood in his stool. "I am certainly not a medical professional but it should not take over a month and a half

to receive adequate medical attention when it is noted in the charts on at least 4 occasions," Shannon Herklotz, the assistant director of the commission, wrote to CCS official Chris Bove in 2015. "Somebody dropped the ball or they simply ignored the request. ... This is very concerning because this appears to be a simple request. It makes me wonder what is being done with the more serious requests??" *Id.*

48.     Dr. Kathryn Locatell, a physician board-certified in internal medicine who regularly investigates abuses in the medical system alongside the California Department of Justice, said the cases pointed to "systemic issues" at CCS facilities, and that the withholding of treatment she saw documented could suggest financial motivation taking precedence. *Id.*

### Incentives Not to Transport Inmates to Off Site Medical Providers

49.     Collin County and WELLPATH/SWCMG created numerous incentives to refuse to transport inmates to off-site medical care, despite an actual need for the care. These incentives were part and parcel of the Cost Containment Program, which WELLPATH/SWCMG proposed to Collin County in its bid for the contract, and which Collin County used to choose WELLPATH/SWCMG to provide services at its jail.

50.     Collin County contracted with WELLPATH/SWCMG to provide medical services to inmates at the Collin County Detention Center.



**HEALTH SERVICES AGREEMENT**

THIS AGREEMENT between Collin County, Texas (hereinafter referred to as the "County"), and Southwest Correctional Medical Group, Inc. (SWCMG), a Corporation (hereinafter referred to as Contractor), is dated for reference purposes as of the August 17 day of 2015 (hereinafter referred to as the "Agreement").  Services under this Agreement shall commence on October 1, 2015, and shall continue in accordance with Sections 8.1 and 8.2.

**ARTICLE 1: HEALTH CARE SERVICES**

1.1     General Engagement. The County hereby contracts with the Contractor to provide for the delivery of medical, dental, and mental health care to individuals committed to the custody of any of the Facilities. The terms and conditions of the accepted Request for Proposal for "Services:  Inmate Health Care, RFP No. 2015-122" is incorporated herein verbatim as if fully set forth. Individuals, who are unconscious, injured or seriously ill at the time of booking shall not be committed to the custody of the Facilities.  These individuals shall be immediately referred to a third party provider for medical attention and their admission and booking (or their return to one of the Facilities) will be predicated on written medical clearance from the third party provider. Contractor will not be responsible for any cost associated with medical care that is delivered prior to an individual's being booked into the facility.

51.     Despite this contract, Collin County is responsible for providing medical care to inmates in the Collin County Detention Center – as is acknowledged in the Health Services Agreement between Collin County and WELLPATH/SWCMG.

**WITNESSETH:**

WHEREAS, the County is charged by law with the responsibility for obtaining and providing reasonably necessary health care for inmates at the Collin County Detention Center located at 4300 Community Avenue, McKinney, Texas  75071 and at the Collin County Minimum Security Facility at 4800 Community Avenue, McKinney, Texas  75071 and the juveniles at the John R. Roach Juvenile Detention Center located at 4700 Community Avenue, McKinney, Texas 75071 (hereinafter referred to collectively as the "Facilities").

## Collin County's Goal to Save Money on Off-Site Medical Care

52.     During the bidding process, Collin County responded to WELLPATH/SWCMG's pre-conference questions by stating that Collin County was looking to keep inmates onsite rather than going to a hospital.

16. Can IV medications be administered? Yes, we are looking good options to keep the inmates onsite rather than going to the hospital.

53.     Collin County even added unsolicited in its comments to WELLPATH/SWCMG during the application process that "The County would like to minimize transport offsite."

Collin County                                    Bid 2015-122

**Comments from Adult Jail**

Each cluster has medical satellite room. This room has a sink.

There is room for x-ray equipment; Collin County does not have equipment onsite.

2 med passes per day

Escort free facility

Facility opened March 1994

This area LVN's are on the market

The County is open to forward thinking ideas/solutions

There is a Wello machine in the booking area to take temperatures.

The County would like to minimize transport offsite.

Cafeteria is available to provider's employees – blue plate special is $3.00

Early ID of Mental Illness is required by statute.  Notice must be made to the courts within 72 hours upon receipt of credible information that establishes reasonable cause to believe a defendant in the sheriff's custody has mental illness or mental retardation.

Once identified:
- Information shall be collected regarding whether the person has a mental illness
- Written assessment shall be provided.

**Comments from Juvenile Facility:**

Licensed counselors on staff

Continuity of care is very important

6/5/2015 4:12 PM                                    p. 9

54.   Collin County went as far as to include this desire for WELLPATH/SWCMG

to eliminate off-site medical care in the Health Services Agreement.

Reports shall also be provided daily to the Collin County Jail Administrator/ Director of Juvenile Probation regarding inmates /juveniles in offsite, hospital care.   Report shall include inmate/detainee/juvenile condition and estimated duration of hospital stay and approximate date of return to Collin County Detention Facility.   As it is Collin County's desire to provide as much

onsite care as possible, it is requested that Contractor Staff confirm the need for continued offsite care through this daily report.

**WELLPATH/SWCMG Promised to Save Collin County Money
on Off-Site Medical Care**

55.    In response to Collin County's desire to save money on off-site transfers,

WELLPATH/SWCMG promised to save Collin County money if WELLPATH/SWCMG

was chosen to provide medical services – mainly by reducing off-site medical care.

## Hospital Services

All hospital services will be performed under the
Hospital and Specialty Services - NCCHC standard J-D-05,
ACA Standard 4-ALDF -4C-05
and Collin County Detention Facilities'
policies, procedures, standards of care,
and prevailing community standards.

SWCMG understands Collin County Detention Facility's request to have as many
tertiary services provided in close proximity of the Collin County Detention Facility.

### Cost Containment Program

In addition to our UM program SWCMG applies
cost containment principles to help control and reduce offsite costs. Key elements
of this program are listed below.

### Proactive Onsite Care Optimization

By optimizing the delivery of medical care onsite, we significantly reduce off-site
transports and offsite care requirements. This not only reduces your cost of off-site
care, but can reduce significantly the cost and burden on your custody staff. As
noted earlier, we recently completed a study in a county with an inmate
population similar to Collin County, comparing off-site transports, before and after
we took over services from one of our large competitors. This study revealed a
27% reduction in off-site transports, saving an estimated 2,700 custody staff hours
(and more than $140,000) each year for transporting inmates.

We will work closely the local emergency rooms and hospitals as well as with the Collin County Detention Facility staff to coordinate and deliver hospital services in order to reduce Collin County Detention Facility correctional overtime and ground transportation costs.

SWCMG appreciates the value of your taxpayer dollars and we are passionate about being responsible stewards of these critical funds. There are inherent risks in every correctional healthcare program, and we take our responsibility seriously. We will work to reduce Collin County's inmate medical related transports by utilizing mid-level healthcare professionals to provide on-site clinics, reducing unnecessary off-site services, expenditures and risks.

- *We deliver a lower TOTAL cost over the long term*. It's easy for a provider to offer a lower price up-front by proposing to hire less expensive, less qualified staff, cutting hours, skimping on staff training, or not filling shifts when staff members are sick or absent. The problem is that the long-term consequences and higher long-term costs are often hidden, and can add up to far more than the apparent savings in the contract.

- Costs like:

    - more trips to the emergency room, hospitalizations and offsite specialist visits

We will operate the healthcare program in a cost-effective manner with full reporting and accountability to Collin County. The vast majority of our programs are either full-risk or shared-risk, where we have significant clinical, operational and financial responsibility for all inmate healthcare services provided by us onsite or by third parties offsite. As a result, over the past 31 years we have developed systems and processes that support the delivery of cost-effective, comprehensive healthcare programs and services that meet the clinical and financial goals of our customers. We will work to keep Collin County's costs down by emphasizing preventative care and providing on-site specialty clinics, both of which help reduce costly offsite transportation, burdens on custody staff, and expensive off-site care.

The vast majority of our programs are either full-risk or shared-risk, where we have significant clinical, operational and financial responsibility for all onsite and offsite health care services. As a result, over the past 31 years we have developed systems and processes that support the delivery of cost-effective, comprehensive health care programs that meet the program goals of our partner-customers. We will work diligently to keep Collin County's costs down by emphasizing preventative care and maximizing onsite services and clinics, both of which help reduce costly offsite transportation, risk to officers, the public and inmate(s), burdens on custody staff, and costly offsite care.



SWCMG employs a cloud-based referral management system, ensuring that all offsite referrals are reviewed and approved by our Chief Medical Officer.

We recently completed a study in a county with an inmate population similar to Collin County, comparing off-site transports before and after we took over services from one of our large competitors. This study revealed a *27% reduction* in off-site transports, saving an estimated 2,700 custody staff hours each year for transporting inmates.

We have seen a significant reduction in offsite transports with the introduction of *Arista MD* to our referral process, helping to reduce the impact of offsite care on our County customers' costs, custody staffing, security, and public safety.

## Collin County Accepted WELLPATH/SWCMG Bid
## Based Off Promise to Keep Costs Low

56.     Instead of looking at quality of care for the inmates, Collin County gave the most weight to cost when it chose WELLPATH/SWCMG to provide medical services at the Collin County Jail.

**Level 4 – Discovery Sessions/Best and Final Offer**

Contractors elevated to Level 4 will be asked to respond in writing to issues and questions raised by the County at the interviews, as well as any other cost and implementation planning considerations in the proposal, and may be invited to present their responses on-site. The County may choose to do site visits during this stage. The County reserves the right to bypass Level 3 in the evaluation process and move directly to Discovery Sessions. Criteria evaluated during this phase include:

- ❑ 25%   Response to questions/clarifications
- ❑ 40%   Updated Cost
- ❑ 35%   Project Staffing

6/5/2015 4:12 PM                                                                                        p. 21

Collin County                                                    Bid 2015-122

Based on the information collected in this phase, a single contractor will be identified as the finalist for contract negotiations. If a contract cannot be reached after a period of time deemed reasonable by the County, it reserves the right to contact any of the other contractors that have submitted bids and enter into negotiations with them.

57.     On August 17, 2015, the Collin County Commissioner's Court, which were the policymakers for Collin County, made up of Keith Self, the Presiding County Judge, Susan Fletcher, County Commissioner for Precinct 1, Cheryl Williams, County Commissioner for Precinct 2, Chris Hill, County Commissioner for Precinct 3, and Duncan Webb, County Commissioner for Precinct 4, all approved the award of Services, Inmate Health Care (RFP No. 2015-122) to WELLPATH/SWCMG.

COURT ORDER NO. 2015- 530 -08-17

THE STATE OF TEXAS

COUNTY OF COLLIN

Subject:  Award, Services, Inmate Health Care - Sheriff

On **August 17, 2015,** the Commissioners Court of Collin County, Texas, met in **regular session** with the following members present and participating, to wit:

| | |
|---|---|
| Keith Self | **County Judge, Presiding** |
| Susan Fletcher | **Commissioner, Precinct 1** |
| Cheryl Williams | **Commissioner, Precinct 2** |
| Chris Hill | **Commissioner, Precinct 3** |
| Duncan Webb | **Commissioner, Precinct 4** |

During such session the court considered a request for approval to award Services, Inmate Health Care (RFP No. 2015-122).

Thereupon, a motion was made, seconded and carried with a majority vote of the court for approval to award Services, Inmate Health Care (RFP No. 2015-122) to **South West Correctional Medical Group, Inc.**  Same is hereby approved in accordance with the attached documentation.

Keith Self, County Judge

Susan Fletcher, Commissioner, Pct. 1

Cheryl Williams, Commissioner, Pct. 2

Chris Hill, Commissioner, Pct. 3

Duncan Webb, Commissioner, Pct. 4

ATTEST:

Stacey Kemp, Ex-Officio Clerk
Commissioners Court
Collin County, T E X A S

\\ccdata01\Commissioner Courts\shephardgt\!!Word Data\Court 2015\COURT ORDERS\08-17-15 Court\Signed\40286 - Services, Inmate Health Care 0817.doc

## **WELLPATH/SWCMG's Incentives to Keep Collin County's Costs Low**

58.    Collin County and WELLPATH/SWCMG incentivized the refusal to transport inmates to off-site medical care through per diems for increasing the number of inmates in the Collin County Jail and for annual compensation escalators for WELLPATH/SWCMG should Collin County continue their contract with WELLPATH/SWCMG.

59.    Collin County agreed to pay WELLPATH/SWCMG a per diem based off the number of inmates housed in the Collin County Jail each day, which incentivized WELLPATH/SWCMG to deny inmates necessary off-site medical care so that the inmates would remain in the custody of the jail.

If during any month of the Agreement the average number of adult inmates/juvenile detainees per day in such month exceeds 1010, the County will pay Contractor the additional sum of per inmate per day as additional compensation.

If the average total number of adult inmates/juvenile detainees per day in such month exceeds 1010 and the average number of adult inmates is over 930 the Collin County Detention and Minimum Security facilities will be invoiced at Ninety-One cents $0.91 per inmate.  If the average total number of adult inmates/juvenile detainees per day in such month exceeds 1010 and the average number of juvenile detainees is over 80 the Collin County Juvenile Detention Facility will be invoiced at Fifty-Six cents $0.56 per juvenile.

60.    Collin County also incentivized the refusal to transport inmates to off-site medical care through compensation escalators and the option to extend the contract with WELLPATH/SWCMG.

61.    WELLPATH/SWCMG was making an annual base (before per diem) of $5,275,262.00 in its contract with Collin County.

**ARTICLE IX: COMPENSATION**

9.1    Base Compensation.  To compensate Contractor for the services provided to the inmates of the Collin County Detention and Minimum Security facilities, the County will pay Contractor $4,841,892.00 the sum of $403,491.00 each month.  To compensate Contractor for the services provided to the juvenile detainees of the Collin County Juvenile Detention Facility, the County will pay Contractor $433,370.00 the sum of eleven equal payments of $36,114.17 each month and one payment of $36,114.13.

62.    Collin County incentivized WELLPATH/SWCMG to keep Collin County's costs low by agreeing to increase the annual base rate for subsequent years of the contract through "compensation escalators," as well as by giving the possibility of extending the contract along with those compensation escalators if Collin County was happy.

9.3 Annual Compensation Escalator. The annual compensation Contractor is to receive pursuant to this Agreement, which includes the base compensation amount and the per diem rate described in paragraph 9.1, for subsequent years of this Agreement, including any extensions, shall include a reasonable increase at the end of each twelve month period of the Agreement to insure the delivery of the same quality and quantity of health services.

## ARTICLE VIII: TERM AND TERMINATION OF AGREEMENT

8.1 Term. This Agreement will be effective at 12:01 a.m. on October 1, 2015. The term of this Agreement shall be through September 30, 2018 Thereafter, based upon fiscal funding appropriation this Agreement may be renewed for two (2) additional one (1) year renewals terms if agreed to in writing by both parties before the expiration of the then current term.

| | | | | Office of the Purchasing Agent |
|---|---|---|---|---|
| ★ COLLIN COUNTY | Contract Amendment | One (1) | | Collin County Administration Building<br>2300 Bloomdale Rd, Ste 3160<br>McKinney, TX 75071<br>972-548-4165 |

| Vendor: | Southwest Correctional Medical Group PLLC | Contract | Inmate Health Care |
|---|---|---|---|
| | 2511 Garden Road, Suite A160 | Contract No. | 2015-122 |
| | Monterey, CA 93940 | | |
| | | Effective Date | 1-Oct-16 |

Awarded by Court Order No.:                  2015-536-08-17
Contract Amendment Court Order No 1.:   2016 - 793 - 10 - 17
Contract Amendment Court Order No 2.:

YOU ARE DIRECTED TO MAKE THE FOLLOWING AMENDMENT TO THIS CONTRACT

1. In accordance with the Health Services Agreement, Section 9.3 "Annual Compensation Escalator" contract price effective October 01, 2016 is hereby increased by 3.0 percent using the U.S. Department if Labor Statistics, Consumer Price Index for Medical Care Services.

Payment for adult detention facilities contract year is $4,987,148.76. Payment will be made monthly in the amount of $415,595.73 per the agreement.

Payment for juvenile detention facility contract year is $446.371.08. Payment will be made monthly in the amount of $37,197.59 per the agreement.

The daily per diem for adult detention facilities will be invoiced $0.94 per inmate. The daily per diem for juvenile detention facilities will be invoiced $0.58 per juvenile.

Except as provided herein, all terms and conditions of the contract remain in full force and effect and may only be modified in writing signed by both parties.

ACCEPTED BY:

Southwest Correctional Medical Group PLLC

Donald Mull (print name)
2511 Garden Road, Suite A160
Monterey, CA 93940

SIGNATURE
TITLE: CFO
DATE: 9-30-2016

ACCEPTED AND AUTHORIZED BY
AUTHORITY OF COLLIN COUNTY
COMMISSIONERS' COURT

Collin County Administration Building
2300 Bloomdale Rd, Ste 3160
McKinney, Texas 75071

Michalyn Rains, CPPO, CPPB
Purchasing Agent
DATE: 11/10/16

63.     Through the Cost Containment Program and the practices and customs of WELLPATH/SWCMG and Collin County, WELLPATH/SWCMG was able to keep Collin County's costs low by refusing to transfer inmates in need of medical care to off-site facilities. As a result, Collin County continued to extend WELLPATH/SWCMG's contract and give WELLPATH/SWCMG compensation escalators.

64.     Collin County agreed to extend WELLPATH/SWCMG's contact from September 30, 2018 through October 1, 2019 and to increase WELLPATH/SWCMG's annual base rate from $5,275,262.00 to $5,489,485.32. The per diem at the adult detention facility was increased from $0.94 to $0.95 per inmate. The per diem for juvenile detention facilities was increased from $0.58 to $0.59 per juvenile.



| | | Office of the Purchasing Agent |
|---|---|---|
| | Contract Amendment   Two (2) | Collin County Administration Building |
| | | 2300 Bloomdale Rd, Ste 3160 |
| | | McKinney, TX 75071 |
| | | 972-548-4165 |

| Vendor: | Southwest Correctional Medical Group, PLLC | Contract | Inmate Healthcare |
|---|---|---|---|
| | 2511 Garden Road | Contract No. | 2015-122 |
| | Suite A160 | | |
| | Monterey, CA 93940 | Effective Date | 10/1/2018 |

Awarded by Court Order No.:       2015-536-08-17
Contract Amendment Court Order No. 1:   2016-793-10-17
Contract Amendment Court Order No. 2:   2018-700-08-27

YOU ARE DIRECTED TO MAKE THE FOLLOWING AMENDMENT TO THIS CONTRACT

1. In accordance with the Health Services Agreement, Section 9.3 "Annual Compensation Escalator" contract price effective October 1, 2018 is hereby increased by 1.03% using the U.S. Department of Labor Statistics, Consumer Price Index for Medical Care Services

Payment for adult detention facilities contract per year will change from $4,987,148.76 to $5,038,516.44 for a total increase of $51,367.68. Payment will be made monthly in the amount of $419,876.37.

Payment for juvenile detention facility contract per year will change from $446,371.08 to $450,968.88 for a total increase of $4,597.80. Payment will be made monthly in the amount of $37,580.74.

The daily per diem for adult detention facilities will change from $0.94 to $0.95 per inmate. The daily per diem for juvenile detention facilities will change from $0.58 to $0.59 per juvenile.

2. In accordance with the Health Services Agreement, Section 9.6 "Changes", contract is amended effective October 1, 2018 to the following:

Addition of 3.9 FTEs to the existing staffing plan to meet increased care requirements.
The Psychiatry staffing will increase from 1.1 to 2.1 FTEs. The MHP staffing will increase from 3.1 to 4.6 FTEs. The LVN staffing will increase to 1.4 FTEs allowing for 24 hour 7 day per week coverage.

| Collin County: Incremental Staffing | | |
|---|---|---|
| Position | FTEs | Price |
| Psych NP | 1.0 | $ 241,900 |
| MHP | 1.5 | $ 134,588 |
| LVN | 1.4 | $ 116,985 |
| On Call | | $ 7,440 |
| Totals: | 3.9 | $ 500,314 |

Establish a $200,000 not-to-exceed cap to Southwest Correctional Medical Group, PLLC on HIV medication expenses.

Addition of reporting to audit HIV medication costs. Pricing to be provided to the County for the 10 HIV drugs typically administered, and invoices will be per patient with the medications listed.

Addition of the Screening Assessment Chart which reflects the time frames and responsibilities that Southwest Correctional Medical Group, PLLC must accommodate.

3. Extend contract from September 30, 2018 through October 1, 2019.

Except as provided herein, all terms and conditions of the contract remain in full force and effect and may only be modified in writing signed by both parties.

65.    Collin County then agreed to extend WELLPATH/SWCMG's contact from October 1, 2018 through September 30, 2020 and to increase WELLPATH/SWCMG's annual base rate to $6,169,493.31. The per diem at the adult detention facility was

increased from $0.95 to $0.98 per inmate. The per diem for juvenile detention facilities was increased from $0.59 to $0.61 per juvenile.

| | | | Office of the Purchasing Agent |
|---|---|---|---|
| | Contract Amendment | Three (3) | Collin County Administration Building 2300 Bloomdale Rd, Ste 3160 McKinney, TX 75071 972-548-4165 |

| Vendor: | Southwest Correctional Medical Group, PLLC | Contract | Inmate Healthcare |
|---|---|---|---|
| | 2511 Garden Road | Contract No. | 2015-122 |
| | Suite A160 | | |
| | Monterey, CA 93940 | Effective Date | 10/1/2019 |

| Awarded by Court Order No.: | 2015-536-08-17 |
|---|---|
| Contract Amendment Court Order No. 1: | 2016-793-10-17 |
| Contract Amendment Court Order No. 2: | 2018-700-08-27 |
| Contract Amendment Court Order No. 3: | 2019-668-08-19 |

YOU ARE DIRECTED TO MAKE THE FOLLOWING AMENDMENT TO THIS CONTRACT

1. In accordance with the Health Services Agreement, Section 9.3 "Annual Compensation Escalator" contract price effective October 1, 2019 is hereby increased by 3% using the U.S. Department of Labor Statistics, Consumer Price Index for Medical Care Services

Payment for adult detention facilities contract per year will change from $5,538,830.44 to $5,704,995.36 for a total increase of $166,164.92. Payment will be made monthly in the amount of $475,416.28.

Payment for juvenile detention facility contract per year will change from $450,968.88 to $464,497.95 for a total increase of $13,529.07. Payment will be made monthly in the amount of $38,708.16.

The daily per diem for adult detention facilities will change from $0.95 to $0.98 per inmate. The daily per diem for juvenile detention facilities will change from $0.59 to $0.61 per juvenile.

2. Extend contract from October 1, 2019 through September 30, 2020.

Except as provided herein, all terms and conditions of the contract remain in full force and effect and may only be modified in writing signed by both parties.

ACCEPTED BY:

Southwest Correctional Medical Group, PLLC

Cindy Watson                    (Print Name)
2511 Garden Road, Ste A160
Monterey, CA 93940
SIGNATURE
TITLE:      Vice President
DATE:       August 6, 2019

ACCEPTED AND AUTHORIZED BY
AUTHORITY OF COLLIN COUNTY
COMMISSIONERS' COURT

Collin County Administration Building
2300 Bloomdale Rd, Ste 3160
McKinney, Texas 75071

Michalyn Rains, CPPO, CPPB
Purchasing Agent
DATE:       9/6/19

66.     As part of the contract between Collin County and WELLPATH/SWCMG, transportation services were to be paid for by Collin County.

> 1.4     Transporting Services.   Non-emergency and emergency transportation services including reasonable security will be provided and paid for by the County.   Contractor is responsible for requesting transportation in accordance with the policies and procedures regarding the transportation of inmates/juveniles for medical reasons mutually developed by Contractor and the County.

> 6.3     Security During Transportation Off-site.   The County will provide security as necessary and appropriate in connection with the transportation of any inmate/juvenile between any of the Facilities and any other location for off-site services as contemplated herein.

67.     Thus, for WELLPATH/SWCMG to keep Collin County's costs down, WELLPATH/SWCMG needed to reduce the number of transfers to off-site facilities for medical care – including necessary medical care.

## **Wellpath Took Over Medical Services for Southwest Correctional Medical Group at the Collin County Jail**

68.     On November 1, 2018, Greg Roberts, Health Services Administrator at the Collin County Detention Facility, sent an email regarding Wellpath taking over after the merger of the two smaller medical care providers, Correctional Medical Group and Corrective Care Solutions. Southwest Correctional Medical Group was part of Correctional  Medical Group and as part of the merger, was now Wellpath.

From: Greg Roberts <greg.roberts@cmgcos.com>
Sent: Thursday, November 1, 2018 4:30 PM
To: James Skinner <sheriffskinner@co.collin.tx.us>; Terry McCraw <tmccraw@co.collin.tx.us>; Bryce Thompson <bthompson@co.collin.tx.us>; Gerard Klahr <gklahr@co.collin.tx.us>; David Barnett <dbarnett@co.collin.tx.us>; Kelley Stone <kstone@co.collin.tx.us>; Matt Langan <mlangan@co.collin.tx.us>; Jimmy Moody <jmoody@co.collin.tx.us>; Michael Sepulvado <msepulvado@co.collin.tx.us>; Christopher Perepczka <cperepczka@co.collin.tx.us>; Chris Barnes <cbarnes@co.collin.tx.us>; Anne Sibley <asibley@co.collin.tx.us>; Hiram Lynn Hadnot <hhadnot@co.collin.tx.us>; Alyse Ferguson <aferguson@co.collin.tx.us>; Candy Blair <cblair@co.collin.tx.us>; Candice Akins <cakins@co.collin.tx.us>; Michelle Charnoski <mcharnoski@co.collin.tx.us>
Subject: Wellpath, the new CCS=CMGC

Partners,
I wanted to share the attached brochure with each of you that has some information about Wellpath, the merged CMG and CCS company. I don't expect any significant changes in our functionality or the ability to deliver quality services to our facilities at Collin County. I remain committed to our partnership and to the successful delivery of quality Adult and Juvenile healthcare. Please always let me know how we can be better and thank you for your continued confidence and support.

Greg Roberts, RN, CCHP
Health Services Administrator
Wellpath, Your Correctional Healthcare Provider
Collin County Detention Facility
4300 Community Blvd
McKinney, TX 75071
972-547-5296 office
469-989-8371 mobile

### Wellpath and the Companies it has Taken Over have a History of Deliberate Indifference to Pregnant Inmates

69.     The following shocking examples display the deliberate indifference Wellpath and the companies which merged to form Wellpath have shown toward pregnant women incarcerated and pleading for medical care.

70.     Jessica Preston was forced to give birth to her son on a jail cell floor in Macomb County, Michigan. As she was in jail awaiting a pre-trial hearing, she went into labor and gave birth to her son on March 20, 2016, on the floor of an "unsanitary cell" in the jail's medical unit. She was a high-risk pregnancy and scheduled for a caesarean-section birth on April 26 of that year. Deliberately indifferent actions and inactions were taken on the part of the physician, nurses, and medical care provider Correct Care Solutions LLC, a medical provider which was bought by Wellpath, Inc. similar to Soutwest Correctional Medical Group. 5:18-cv-12158-JEL-MKM.

71.     Tammy Jackson was incarcerated in the Broward County Jail in Fort Lauderdale, Florida. She was pregnant and began complaining of contractions. Instead of transporting Ms. Jackson to the hospital, staff attempted to contact an on-call physician allowing hours to pass as Ms. Jackson continued in labor, alone in an isolation cell. Ms. Jackson remained bleeding and in the isolation cell for hours until she gave birth without medication or the assistance of a physician.

72.     Christina Marziale went into a facility in White Hall, Arkansas when she was seven months pregnant. She gave birth to her twins through emergency cesarean section. Marziale was not fed appropriately and did not receive prenatal care under a physician's supervision. Medical staff threatened her with discipline if she kept coming to the nurse's office to seek prenatal care from a doctor. 18-cv-00086-DPM.

73.     Shawna Tanner gave birth to her baby boy who died during delivery in the Metropolitan Detention Center in Albuquerque, New Mexico in 2016. The medical team at MDC was understaffed, undertrained, and neglected the mother in labor for more than 24 hours. When Tanner went into labor she experienced twenty four hours of pain and negligence. No medical provider was present that day and Tanner's requests to go to the hospital were denied by staff. She was instead moved to a cell by herself where she gave birth. 1:17-cv-00876-JB-JFR.

74.     Chelsea Harris was incarcerated for failure to pay a municipal ticket when she was about 26 weeks pregnant, and her pregnancy was classified by her doctor as high risk. She received inadequate care in the jail resulted in her baby being born three months early and weighing just 2 pounds, 10 ounces. She had emergency obstetrical symptoms and preterm labor, but non-medical and medical staff ignored her pleas for help even though they could see she was in pain. She continued to experience lower abdominal pain and other symptoms, but jail staff refused to provide care. 2:20-cv-00373-WCG.

75.     Kelsey Love gave birth alone and without medical help in a Kentucky jail cell. Staffers at the Franklin County Regional Jail were indifferent to her medical needs as she screamed in pain on the floor during her labor and delivery in May 2017. 3:18-cv-00023-GFVT-MAS.

76.     Candace Steel was in the Santa Rita Jail in Dublin, California, awaiting trial on a charge of misdemeanor trespassing when she began to feel birth pangs. She told officers on duty she believed the birth of her daughter was imminent. They ignored her, she says, leaving her unattended in an isolation cell where she delivered her baby Hope by herself. The umbilical cord was wrapped around Hope's neck and she was not breathing. So, Steel stuck her finger down Hope's throat, prompting the baby to scream

and draw her first breath. Correctional officers finally came to Steel's aid when they heard Hope crying and discovered she had delivered her baby herself on the floor of a jail cell. The Alameda County Sheriff's Office, like many county jail service providers in California, outsources medical care in correctional facilities to a group called California Forensic Medical Group. **The medical group had a pecuniary interest in keeping costs down for its client, so the jail wardens' repeated refusal to send her to the hospital was part of a pattern or policy at the jail**. However, after her visit to the hospital Steel continued to complain of pains and cramps. Steel was then put in an isolation cell instead of receiving the type of adequate medical care the situation warranted. Steel filed suit, and **United States District Judge James Donato sided with Steel, saying the jail failed to provide adequate care and that its contract with California Forensic Medical Group (CFMG) created incentives to decline outside help. "On a more fundamental level, there can be no doubt that the way defendants treat pregnant woman in labor is a textbook example of deliberate indifference," United States District Judge Donato wrote.** Neighboring counties like Contra Costa and San Francisco use alternative providers, such as their own public health departments, meaning the economic incentives to keep costs down are different, United States District Judge Donato wrote. Therefore, it wasn't simply an isolated incident, but Steel's experience at the jail was part of a pattern of behavior created by the county's decision to outsource its medical care at the Santa Rita Jail. **The contract between the sheriff's office and CFMG established a de facto policy and practice of denying hospital care and other potentially costly procedures to detainees," United States District Judge Donato wrote. "The decision by**

Alameda County to outsource the medical care of detainees under a contract with CFMG was exactly that."

77.     Shaye Bear gave birth on May 17, 2018, on the floor of an isolation cell at the Ellis County Jail in Texas. Her baby survived only nine days following his traumatic and premature birth. Shaye had been experiencing labor for two days, but jail guards dismissed her screams of pain and a doctor employed by Correct Care Solutions misdiagnosed her condition. She told the doctor that she had been experiencing labor pains for two days and full contractions for hours. The doctor measured her cervix and decided she was not in labor. He said her vaginal bleeding was likely due to an infection. But Bear was not seen again by a doctor or transported to a hospital. Instead, she was moved to an isolation cell where her screams of pain were ignored by guards who had convinced themselves she was faking a medical problem. Shaye delivered a one-pound, two-ounce baby in that single cell screaming for hours, begging them to come and help her. 3:20-cv-01278-N.

78.     Curiously, Wellpath even includes in their Frequently Asked Questions (FAQ) section of their website a reference to the high number of lawsuits against the facilities they operate.

### Collin County Adopted WELLPATH/SWCMG's Policies and Practices When Collin County Chose to Contract with WELLPATH/SWCMG to Provide Medical Care in the Jail

79.     Collin County has a Constitutional duty, which cannot be delegated, to provide adequate medical care to inmates in its charge.

80.     Collin County chose to contract with WELLPATH/SWCMG to provide medical services at the Collin County jail because of WELLPATH/SWCMG's promise in its Proposal for the contract to reduce costs through the Cost Containment Program.

81.     Thus, Collin County adopted the WELLPATH/SWCMG policies as its own when Collin County made the conscious decision through its policymakers – the Sheriff of Collin County and the Collin County Commissioner's Court – to choose WELLPATH/SWCMG to provide medical services at the Collin County jail.

82.     Both WELLPATH/SWCMG's Cost Containment Program, which was adopted by Collin County and required nurses in the jail to refuse, deny, and avoid transferring inmates to offsite medical providers for the purpose of reducing costs, along with the WELLPATH/SWCMG protocols which were adopted by Collin County requiring pregnant women in clear and obvious medical distress to soak two pads full of blood before being given medical care, which helped further the goal of the Cost Containment Program, directly caused Ms. Kent to receive no medical care, to suffer in excruciating pain, and ultimately to lose her baby.

83.     Collin County continually worked with WELLPATH/SWCMG in creating, maintain, and reviewing, and amending policies, as well as approved WELLPATH/SWCMG policies, which establishes that WELLPATH/SWCMG's policies were Collin County's Policies – including the Cost Containment Program.

> 6.46 To the extent any inmate/juvenile requires off-site health care treatment (general hospitalization, specialty services, etc.) Collin County will provide appropriate routine nonemergency transportation services including reasonable security, as requested by Provider. Emergency ambulance transportation of inmates/ juveniles, as directed by Provider personnel, will be provided and paid by Collin County. Policies and procedures regarding the transportation of inmates/juveniles for medical reasons will be mutually developed by Collin County and Provider within thirty (30) days of contract start date. The policies shall be approved by the Collin County Jail Administrator/Director of Juvenile Probation.

6.60 Provider will confer as needed with the Collin County Jail Administrator/ Director of Juvenile Probation concerning existing health related procedures within the Collin County Detention Facilities, and for the purpose of making changes, from time to time, of such procedures and other practices reasonably related thereto as Provider and Collin County shall deem advisable.

**Comply.**

6.61 Provider on-site Medical Director, Health Administrator, as well as Provider regional representative, as needed, and any other management representative, as needed, as Collin County deems necessary shall meet at a minimum on a monthly basis with Collin County Jail Administrator/Director of Juvenile Probation, Collin County Health Care Services Director or designee and any other representative as deemed necessary to discuss health care policies, procedures, problems, schedules, cures, etc. Schedule of review meetings will be established by the Collin County Jail Administrator/Director of Juvenile Probation.

SWCMG and Collin County's Director of Detention Services/Director of Juvenile Probation will review the customized P&P Manual at least annually, and we will make revisions and updates as needed. Any changes are presented to Collin County to keep the manual current and maintain compliance all applicable standards as well as the facility's needs. The Detention Administration will be notified of any changes.

### WELLPATH/SWCMG's and Collin County Policy Incentivized Refusing Off-Site Medical Care for Indigent Inmates

84.     WELLPATH/SWCMG's policy explicitly states that WELLPATH/SWCMG will only pay for services after all third-party efforts have bene exhausted after seeking information concerning health insurance from each inmate treated.

5.4     Third Party Reimbursement. Contractor will seek information concerning health insurance which would cover services provided by Contractor from each inmate treated, as allowed by law. Payment for services will only be made by Contractor after all third party efforts have been exhausted. A report detailing all third party reimbursement will be provided to the County on a quarterly basis.

85.     Thus, for indigent inmates such as Ms. Kent who did not have health insurance, WELLPATH/SWCMG's policy incentivized refusing to transfer her to an off-site medical facility since WELLPATH/SWCMG would be responsible for the cost.

86.     However, the Health Services Agreement with Collin County actually provides that WELLPATH/SWCMG would not be responsible for these off-site costs, which means those costs for uninsured indigent inmates would fall onto Collin County.

> 9.4    Contractor's Financial Responsibility.   Contractor is responsible for the costs associated with intake health screenings, regularly scheduled sick call, nursing coverage, regular physician visits on site, infirmary care, chronic care clinics, on-site emergency medical care, medical records management, clinical labs (as that term is defined in Collin County's Request for Proposal), health education services, utilization review, a quality assurance program, other administrative support services, medical and office supplies, pharmacy and pharmaceutical services, EKGs, waste disposal, accreditation fees, all needed equipment to set up a dental suite for the juvenile facility, a performance bond, and on-site emergency medical treatment for visitors and County personnel.   Contractor will not be financially responsible for costs associated with any off-site treatment, hospitalization, medical specialty services (whether provided on-site or offsite), radiology services, and transportation services.   Contractor is to provide services to the inmates /juveniles in the physical custody of the County.   Contractor will not be financially responsible for any person remanded to, or in the custody of, any other law enforcement officer or agency or other correctional/detention facility of any city, county, state or federal authority.   This contract specifically excludes medical care provided to inmates/juveniles under the jurisdiction of Collin County but incarcerated in a facility owned by, operated by, and/or located in another county or state.

87.     Thus, since WELLPATH/SWCMG had numerous incentives to reduce Collin County's costs, especially as they related to off-site medical transfers, the WELLPATH/SWCMG and Collin County policy incentivized WELLPATH/SWCMG refusing to transfer uninsured indigent inmates, such as Ms. Kent, so that Collin County would not bear the cost of the medical care, and WELLPATH/SWCMG would continue to receive contract extensions and compensation escalators.

**Shocking Deliberate Indifference Leads to the Death of Ms. Kent's Child**

88.     On May 30, 2019, Ms. Kent was arrested and detained at the Collin County Jail on a charge of Credit Card or Debit Card Abuse.

89.     Ms. Kent was homeless and pregnant and used a credit card that she found in a parking lot to buy groceries.

## Ms. Kent Alerted Jail Staff That She was Pregnant When She Entered the Collin County Jail

90.     When Ms. Kent was booked into the Collin County Jail, she informed the staff that she was pregnant.

91.     On May 30, 2019, Ms. Kent told LVN Emily Burris that she was pregnant.

92.     Additionally, Ms. Kent listed Amia Higgins ("Ms. Higgins") as her emergency contact with the jail. Amia Higgins was the case worker at Cradle of Hope helping Ms. Kent through her pregnancy and possible adoption of her unborn child.

93.     Defendant Latori Abii, PA, ("Defendant Abii") gave Ms. Kent a pregnancy test on May 30, 2019, which confirmed that Ms. Kent was pregnant.

94.     On June 3, 2019, Ms. Higgins called the Collin County Detention Center, informed the jail staff that Ms. Kent was pregnant and in need of medical services, and then asked that Ms. Kent receive prenatal medical care.

95.     On June 3, 2019, Kimberly Stapert, LCSW, noted in Ms. Kent's file that Ms. Kent was three and a half months pregnant with twins.

96.     On June 6, 2019, Defendant Abii met with Ms. Kent.

97.     Ms. Kent explained to Defendant Abii that she was considered a high-risk pregnancy.

98.     Defendant Abii noted that Ms. Kent was not experiencing any vaginal bleeding at the time.

| 2019-BK-08305 | CC-Pregnancy Initial | Any vaginal bleeding since last menstrual period? | No | | Abii PA, Latori | 06-06-2019 9:38 am |
|---|---|---|---|---|---|---|

99.     Thus, any future vaginal bleeding reported by Ms. Kent would be a new issue that would need medical attention.

100.    Defendant Abii did not use a fetal doppler to monitor the unborn child.

| 2019-BK-08305 | CC-Pregnancy Initial | Fetal heart tones (between 10-12 weeks if doppler available) : | no fetal doppler | Abii PA, Latori | 06-06-2019 9:38 am |
|---|---|---|---|---|---|

101.    Defendant Abii placed Ms. Kent on a pregnancy diet, placed Ms. Kent on the chronic care list, gave her a bottom bunk designation, and completed a medical flag form which was delivered to detention staff for Ms. Kent.

102.    Thus, anyone looking at Ms. Kent's file could verify that Ms. Kent is pregnant.

103.    Defendant Abii then scheduled Ms. Kent for a follow up in one month.

### WELLPATH/SWCMG's Employees and the County's Employees Refused to Treat Ms. Kent

104.    Ms. Kent asked to see a doctor almost every day.

105.    However, Ms Kent did not see a doctor the entire time she was pregnant in the Collin County Jail.

106.    Following her June 6, 2019 appointment with Defendant Abii, Ms. Kent began to experience abdominal pain, abdominal cramping, and vaginal bleeding.

107.    Ms. Kent requested a doctor due to her abdominal pain, abdominal cramping, and vaginal bleeding.

108.    WELLPATH/SWCMG staff, including each of Defendant Atiba, Defendant Pounders, Defendant Abii, and Defendant McBride, were aware that Ms. Kent was pregnant.

109.   Ms. Kent alerted WELLPATH/SWCMG staff, including each of Defendant Atiba, Defendant Pounders, Defendant Abii, and Defendant McBride, about her abdominal pain, abdominal cramping, and vaginal bleeding.

110.   WELLPATH/SWCMG staff, including each of Defendant Atiba, Defendant Pounders, Defendant Abii, and Defendant McBride, were aware that the issues Ms. Kent was experiencing were symptoms of serious medical issues related to her pregnancy – abdominal pain, abdominal cramping, and vaginal bleeding.

111.   WELLPATH/SWCMG staff, including each of Defendant Atiba, Defendant Pounders, Defendant Abii, and Defendant McBride, refused to provide Ms. Kent with medical attention in response to her complaints and requests, despite knowing that Ms. Kent was pregnant, complaining of continued abdominal pain, continued abdominal cramping, and continued vaginal bleeding, and requesting medical care and to see a doctor.

112.   However, WELLPATH/SWCMG staff, including each of Defendant Atiba, Defendant Pounders, Defendant Abii, and Defendant McBride, refused to provide Ms. Kent with a doctor or transfer her to a hospital or other offsite medical provider to receive the medical care that she obviously and clearly needed as a result of WELLPATH/SWCMG and Collin County's Cost Containment Program.

113.   Ms. Kent's requests for medical attention were documented as they were made through the jail's kiosk. Screenshots of Ms. Kent's requests and WELLPATH/SWCMG medical staff responses are included below.

114.   On June 5, 2019, Ms. Kent sent the following to WELLPATH/SWCMG medical staff:

06/05/2019  07:08 pm
   ORIGINAL REQUEST:
      HI. IM LAUREN KENT. IM 3 1/2 MONTHS PREGNANT WITH TWINS. I HAVENT BEEN ABLE TO FALL ASLEEP  FOR 3
      DAYS. AND IM SO TIRED. I DONT KNOW WHAT TO DO. IVE BEEN TAKING 2 SHOWERS A DAY AND EATING JUST
      FINE.

115.  Two days later, on June 7, 2019, WELLPATH/SWCMG Nurse Darnell responded:

06/07/2019  11:06 am                                               SDARNELL
   CLOSED:
      Insomnia is not treated at this facility, however, you can discuss with the chronic care provider at your next routine visit.

116.  WELLPATH/SWCMG staff, knowing that Ms. Kent was pregnant and in pain, refused to accommodate her request for an additional mat.

117.  WELLPATH/SWCMG staff, was aware that Ms. Kent would remain in pain and that the health and safety of her and her unborn child would be in danger if they refused to provide a mat; however, they made the deliberate decision to deny Ms. Kent a second mat.

118.  On June 14, 2019, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff requesting a doctor due to her pregnancy:

06/14/2019  03:55 pm
   ORIGINAL REQUEST:
      HELLO. I AM POSITIVE I AM PREGNANT WITH TWINS. I WAS TOLD BY TORY LAST WEEK THAT I WOULD BE
      TAKEN TO THE DOCTOR SOMETIME THIS WEEK. I DO UNDERSTAND I CANT BE GIVEN A DATE BUT PLEASE
      UNDERSTAND HOW IMPORTANT THIS IS. I  AM HAVING AN ADOPTION WITH MY BABIES AND MY BABIES
      ATTORNEY NAME IS AMIA HIGGINS WITH A CRADLE OF HOPE. I HAVE TOURETTES AND AFTER EATING THE
      NOISE I MAKE IS ALWAYS THE LOUDEST. THE GUARDS KNOW THIS TO BE A FACT. MY BABIES JUMP INSIDE ME
      A TURN AROUND AND THAT IS VERY SCARY FOR ME BECAUSE I DONT WANT THEM TO GET A KNOT IN THEIR
      IMBILICAL CORD. THAT IS THEIR SOURCE OF LIFE. I HAVE THE NAME AND NUMBER TO MY DOCTOR WRITTEN
      ON THE PAPERS IN MY BACKPACK WHICH IS IN MY PROPERTY. PLEASE HELP ME GET TO MY DOCTOR SO SHE
      CAN CHECK ONMY BABIES.  AGAIN AMIA HIGGINS MY BABIES ATTORNEY WILL BE HELPING IN ALL WAYS THAT
      SHE CAN. I NEED TO GET TO  MY BABIES DOCTOR. THANK YOU

119.  When Ms. Kent stated "I was told by Tory last week…" she was referring to Defendant Latori Abii.

120.  WELLPATH/SWCMG User OTWORI responded early in the morning on June 15, 2019 by simply stating, "received".

06/15/2019  03:04 am                                               OTWORI
   CLOSED:
      received

121.     However, WELLPATH/SWCMG staff refused to provide Ms. Kent with the medical attention she was requesting for the care of her and her unborn child despite Ms. Kent clearly stating how important the medical care was for her and her unborn children and even giving Ms. Higgins' name and stating Ms. Kent had the contact information for her doctor in her backpack.

122.     Ms. Kent had now been in the Collin County Jail for sixteen days and had not seen a doctor, despite her requests.

123.     On June 20, 2019, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff:

> 06/20/2019  04:20 pm
>      ORIGINAL REQUEST:
>           HELLO. I WEIGHED 153 BEFORE MY PREGNANCY. IVE GAINED NEARLY LIKE 25 POUNDS. OMG. MY BACK HAS
>           BEEN HURTING WHEN I WAKE UP FOR THE PAST WEEK. IT ALSO TAKES A LONG TIME FOR ME TO FALL
>           ASLEEP. MAY I PLEASE HAVE A SECOND MAT. THANK YOU VERY MUCH

124.     WELLPATH/SWCMG staff simply responded:

> 06/20/2019  06:24 pm                                                          ADEKOLA
>      CLOSED:
>           Are you in third trimester?

125.     WELLPATH/SWCMG's policy was not to provide a mat for pregnant women unless they were in their third trimester. This policy is not supported by any medical evidence and is another example of WELLPATH/SWCMG's policy not to provide medical care or attention until the inmate has suffered to the point that the inmate is in the most dire of situations – which necessarily means the inmate has experienced continued pain and suffering up until that point.

126.     On June 21, 2019, Ms. Kent, who was continuing to experience back pain, wrote the following to WELLPATH/SWCMG medical staff:

> 06/21/2019  03:43 pm
>      ORIGINAL REQUEST:
>           I AM A LITTLE OVER 4 MONTHS PREGNANT NOW WITH MULITIPULS. TWINS. FOR OVER A WEEK NOW IVE BEEN
>           WAKING UP WITH SEVER BACK PAIN. THATS WHY IM REQUESTING A SECOND MAT. PLEASE

127.    The following day, WELLPATH/SWCMG staff simply responded:

06/22/2019 01:44 pm                                                    FHAMMID
        CLOSED:
                YOUR CALL WILL BE ANSWERED IN THE ORDER IN WHICH IT WAS RECEIVED WITH IN 72 HOURS THANKS FOR
                YOUR PATIENCE

128.    The staff never brought Ms. Kent a mat or responded to this request.

129.    Ms. Kent continued to request a second mat to alleviate the pain she was experiencing; however, WELLPATH/SWCMG staff continued to make the deliberate choice to refuse her requests and ignore her issues despite knowing that she was pregnant and the pain she was complaining of presented a threat of serious harm to her and her unborn child.

130.    On June 21, 2019, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff:

06/21/2019 03:44 pm
        ORIGINAL REQUEST:
                THE A/C IN MY CELL DOES NOT WORK PROPERLY. IT IS SO HOT ALL THE TIME. I WAKE UP DRIPPING SWEAT
                EVERYDAY

131.    WELLPATH/SWCMG staff simply responded:

06/21/2019 03:49 pm                                                    12053
        CLOSED:
                Talk to the pod officers so they may address this issue.

132.    However, the Colling County Jail pod officers, including Officer Howard, refused to help Ms. Kent with the heat issue as well.

133.    On June 22, 2019, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff:

06/22/2019 04:24 pm
ORIGINAL REQUEST:
THERE IS A POSSIBILITY THAT I AM FURTHER ALONG IN MY PREGNANCY. I DONT KNOW, I HAVENT ONCE BEEN TO THE DOCTOR. IVE JUST BEEN TO THE ER TWICE. BEFORE I WAS ARESSTED I WAS FINALLY APPROVED FOR MEDICADE AND HAD I DOCTORS APPOINTMENT LINED UP. I AM BIG ENOUGH TO BE 6 TO 7 MONTHS PREGNANT. I AM HOPING IM ONLY 4 MONTHS. I KNOW FOR SURE THAT I GOT TWO BABIES IN ME. I FEEL I NEEDED TO LET YOU KNOW THIS. I REALLY NEED A SECOND MAT I AM HURTING EVERY NIGHT AND VERY UNCOMFORTABLE. MAKES IT SO MUCH WORSE AS WELL THAT THE A/C IN MY ROOM DOESNT WORK PROPERLY. ALL THIS ADDS TO A VERY HIGH STRESS LEVEL AND I AM FEELING IT AND IM VERY WORRIED ABOUT THE HEALTH OF MY BABIES INSIDE ME. ADD MY TOURETTES DISORDER TO MY STRESS AND IM A HOT MESS. THANK YOU IN ADVANCE FOR AGAIN READING ONE OF MY REQUESTS AND BLESS YOU FOR YOUR HELP.

134.   WELLPATH/SWCMG staff responded:

06/22/2019 10:28 pm                                                    NYAMWAYA
CLOSED:
Your sick call has been received and you will be seen according to level of acuity, typically within 72 hours.  Thank you for your patience.

135.   Horribly, WELLPATH/SWCMG staff continued to ignore Ms. Kent's requests for medical assistance.

136.   Ms. Kent had now been in the Collin County Jail for twenty-four days and had not seen a doctor, despite her repeated requests as well as Ms. Higgins calling on June 3, 2019 requesting Ms. Kent receive medical care and prenatal care due to her pregnancy.

137.   On June 27, 2019 at 15:47:16, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff:

06/27/2019 03:47 pm
ORIGINAL REQUEST:
I HAVE HAD 4 SUDDEN SEVER PAINS TO MY LOWER ABDOMEN TODAY. I AM 4 MONTHS PRRGNANT WITH TWINS. I HAVE HAD  MUCUS BLOOD STUFF WHEN I JUST NOW WENT TO THE REST ROOM.

138.   WELLPATH/SWCMG staff responded at 22:41:03:

06/27/2019 10:41 pm                                                    FSOLLETT
RESPONSE:
as the nurse instructed you, please keep a pad count.  inform POD Ofc you have something to give medical and they will call us.  Thank you

139.   This response is alluding to the "24-hour pad count" that WELLPATH/SWCMG staff continued to instruct Ms. Kent to keep in an effort to prove

she was bleeding the amount they required for her to be given medical care pursuant to WELLPATH/SWCMG and Collin County policies.

140.   This falls in line with WELLPATH/SWCMG and Collin County's requirement before providing emergency medical care as the inmate suffering a "life or limb threatening illness or injury."

141.   This falls in line with WELLPATH/SWCMG and Collins County's Cost Containment Program, aimed at reducing costs to Collin County by avoiding off-site medical care for inmates until the direst of situations arise.

142.   WELLPATH/SWCMG staff, including Defendant Atiba and Defendant Pounders, advised Ms. Kent that she needed to saturate multiple pads with blood for them to be able to give her the prenatal medical care she was requesting.

143.   WELLPATH/SWCMG staff, including Defendant Atiba and Defendant Michelle, advised Ms. Kent that if they did not see the blood, then it did not happen.

144.   However, the majority of the blood loss that Ms. Kent was experiencing occurred when she used the restroom.

145.   Ms. Kent's need for emergency medical care was apparent even to a layperson with no formal medical training or experience as anyone hearing that a pregnant woman was suffering continuous abdominal pain, abdominal cramping, and vaginal bleeding would know that she needs medical attention to ensure the health and safety of both the pregnant woman and the baby are stable.

146.   Yet, WELLPATH/SWCMG staff, including Defendant Atiba, Defendant Pounders, and Defendant Abii continued to deny Ms. Kent medical care and attention despite knowing the serious nature of her issues and the danger to her and her unborn child – further displaying the deliberate indifference to Ms. Kent's medical needs and

demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

147.    On June 27, 2019 at 19:15:27, Ms. Kent wrote the following to Sgt. Compton:

06/27/2019  07:50 pm
     ORIGINAL REQUEST:
          ATTN LT. MCCULLOUGH OR SGT. COMPTON, I AM CURRENTLY 4 MONTHS PREGNANT WITH TWINS AND AM
          CONCERNED ABOUT THE AMOUNT OF CARE I AM RECEIVING.  I WOULD LIKE TO DISCUSS THIS WITH EITHER
          OF YOU ASAP. THANK YOU VERY MUCH.

148.    Days went by without Ms. Kent receiving a response.

149.    Three days later, on June 30, 2019 at 18:34:50, Ms. Kent added the following to her last message:

06/30/2019  06:34 pm
          INMATE RESPONSE:
               PLEASE DONT FORGET ABOUT ME. THANK YOU

150.    On June 30, 2019 at 19:47:50, Sgt. Compton finally responded to her message sent on June 27, 2019 and her follow-up message on June 30, 2019, stating:

06/30/2019  07:47 pm                                              02378
     RESPONSE:
     Ms. Kent,
     I spoke with you on 06/30/19 and recommended you submit a request to speak with a counselor.  You stated you have an
     appointment with P.A. Tori on 07/04/19 and I recommended you discuss all your pregnancy concerns during the
     appointment.  Notify the Pod Officer immediately if at anytime you feel you are having medical issues or a medical
     emergeny.
     Sgt. Compton

151.    In this response, Sgt. Compton was alluding to his discussion that he had with Ms. Kent that day following her message not to forget about her.

152.    During that discussion, Ms. Kent explained to Sgt. Compton that she was experiencing abdominal pain, abdominal cramping, and vaginal bleeding and was highly concerned for the welfare of her unborn children, as she was not receiving medical care or attention.

153.    Despite having that knowledge, Sgt. Compton did nothing to provide Ms. Kent with the medical attention she clearly and obviously needed.

154.    Instead, Sgt. Compton advised Ms. Kent to wait until her appointment with Defendant Abii on July 4, 2019 – as was the policy of WELLPATH/SWCMG and Collin County – further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

155.    Sgt. Compton also advised Ms. Kent to contact a pod officer if she felt she was having medical issues or a medical emergency.

156.    However, every time Ms. Kent contacted a pod officer or medical staff, her requests were ignored or denied – similar to this discussion with Sgt. Compton– further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

157.    The next day, on July 1, 2019 at 7:45:30, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff:

> 07/01/2019  07:45 am
>     ORIGINAL REQUEST:
>         IM PREGNANT WITH TWINS. IM SPOTTING A LOT AND CRAMPING. I HAVENT FELT MY BABIES MOVE IN OVER 24
>         HOURS. I JUST SAW A BLOOD CLOT IN THE TOILET AFTER GOING POTTY. IM CRAMPING REL BAD

158.    WELLPATH/SWCMG Nurse Defendant Julia McBride responded at 13:15:37:

> 07/01/2019  01:15 pm                                        JMCBRIDE
>     CLOSED:
>         Your sick call has been received. You will be seen at the next available sick call. Please be advised you will be subject to a
>         $10 nurse sick call fee. If referred to the provider, you will be subject to an additional $15. All medications prescribed are
>         $3 per medication. Thank You

159.    Defendant McBride responded to Ms. Kent informing them that she had not felt her babies move in twenty-four hours and had just passed a blood clot by telling her

she would be charged fees for being seen by the nurse and if she was referred to a provider she would be charged another fee.

160.    This was Defendant McBride's attempt to deter Ms. Kent from seeking off-site medical care under the WELLPATH/SWCMG and Collin County Cost Containment Program.

161.    According to the "Facility Medical charges policy," inmates would not receive fees for "true medical emergencies as determined by medical staff." The policy further explained, "Note that emergency medical care is defined as "life or limb threatening illness or injury."

162.    WELLPATH/SWCMG    staff,    following    custom    and    practice    of WELLPATH/SWCMG, refused to provide her with emergency medical attention because it would increase costs which were promised to be kept low in their original Proposal for Collin County's contract, according to WELLPATH/SWCMG's Cost Containment Program, which was adopted by Collin County.

163.    Instead of providing medical attention to Ms. Kent, they deliberately chose to ignore her cries for help and to deny her and her unborn child medical care.

164.    Two days later, on July 3, 2019 at 13:40:00, Ms. Kent wrote the following to WELLPATH/SWCMG medical staff:

07/03/2019  01:40 pm
    ORIGINAL REQUEST:
        PLEASE IVE BEEN CRAMPING ALL WEEK. ITS REALLY BAD TODAY. IM PEGNANT WITH TWINS. IVE COLLECTED
        THE BLOODY PADS LIKE YOU WANTED ME TO. IM VERY WORRIED ABOUT MY BABIES.

165.    Defendant McBride responded at 17:35:22:

07/03/2019  05:35 pm                                          JMCBRIDE
     CLOSED:
     You have been attented to my the morning nurse, in which you came to the med sat with paper towel with no suturation of
     blood but thin spot of blood on the paper towel. i just came back from your Pod assessing you right now when called by the
     pod officer that you are crying and yelling. Report had been given to the charge nurse about your non compliant to medical
     treatment / instruction. A 24 hour pad count had scheduled for you starting today 7/3/2019 2pm and ends 2pm 7/4/2019. if
     you feels you have used more than 2 pads saturated  with blood within the next 30 minutes as you had been informed by
     me after assessing you right now please bring the soak pads or let the pod officer call med sat. per  assessment your
     issue is more of behavoural than medical. Thanks and God bless, we are here to serve you.

166.    Defendant Atiba is the "morning nurse" Defendant McBride alluded to in her response.

167.    Defendant Atiba was aware that Ms. Kent was pregnant.

168.    Defendant Atiba spoke with Ms. Kent in person and saw the paper towel with blood on it that she showed him.

169.    **Defendant Atiba told Ms. Kent that she was not going to receive medical attention until her 24-hour pad count showed that she had saturated two pads with blood in a thirty-minute period** – further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program**.**

170.    Defendant McBride then stated in her response to Ms. Kent that **Ms. Kent needed to saturate more than two pads with blood "within the next 30 minutes"** – further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

171.    Defendant Atiba was explaining the WELLPATH/SWCMG and Collin County pad count policy that multiple WELLPATH/SWCMG staff members had instructed Ms. Kent to perform.

172.    Defendant Atiba saw Ms. Kent in pain from cramping.

173.    Defendant Atiba heard Ms. Kent yelling from the pain.

174.    Instead of providing Ms. Kent with medical attention, Defendant Atiba wrote Ms. Kent up for being non-compliant with the 24-hour pad count– further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

175.    Defendant McBride stated that Ms. Kent's medical issues were more of a behavioral problem than actual medical issues – further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

176.    Defendant McBride classified Ms. Kent's medical issues as behavioral because if the WELLPATH/SWCMG medical staff classified Ms. Kent's issues as behavioral instead of medical, then they could avoid falling into WELLPATH/SWCMG's and Collin County's definition of an emergency medical care situation of suffering a "life or limb threatening illness or injury" and would continue saving costs.

177.    Additionally, according to the "Facility Medical charges policy," inmates would not receive fees for "true medical emergencies as determined by medical staff"; thus, by noting that Ms. Kent's issues were behavioral instead of medical they could charge Ms. Kent for any medical care they actually did provide her in the future.

178.    Defendant McBride then typed, "we are here to serve you," which clearly was not the case as every time Ms. Kent asked for help, it was ignored or denied.

179.    Officer Howard witnessed the interaction between Defendant Atiba and Ms. Kent.

180.   Officer Howard wrote two incident reports on Defendant Atiba for his interaction with and treatment of Ms. Kent.

181.   In the first incident report Officer Howard wrote regarding Defendant Atiba, Officer Howard described witnessing Ms. Kent in tears and explaining to Defendant Atiba that she had been cramping for a week, that the cramping had become constant, that she had been spotting vaginal blood but was now bleeding heavily as if she was on her menstrual cycle, that she had not felt her babies move in twenty-four to thirty-six hours, and that she had placed sick calls all week regarding her declining condition.

182.   However, despite Defendant Atiba having this conversation with Ms. Kent, knowing she was pregnant, and witnessing her obvious distress – Defendant Atiba followed WELLPATH/SWCMG and Collin County policy by refusing to provide emergency medical care and continuing to order Ms. Kent to do a pad count pursuant to WELLPATH/SWCMG and Collin County protocols.

Narrative:     On 07.03.2019 at 1500, I Officer Glenda Howard was assigned to post MS1B as Pod Officer, radio MSB-Pod. I had a conversation with Inmate Kent, Lauren # 173295. At approximately 1405 Nurse Jalill was in and spoke with Kent by the pod desk. She was in tears and explaining to him how she had been cramping for a week. And today the cramping was constant. She had been spotting until today and the bleeding was consistent as if she was on her menstrual cycle. She stated that is had been 24 to 36 hours since she had felt the babies move. Kent is pregnant with twins. Kent also stated that she had put in sick calls everyday regarding her declining condition. Kent is scheduled to see PA Cory tomorrow. Kent explained that she is emotionally and physically exhausted. She is currently 4 1/2 months pregnant.

End of report.

183.   Officer Howard felt compelled to write a second incident report on Defendant Atiba regarding another interaction with Ms. Kent that same day.

184.   In this report, Officer Howard described witnessing Defendant Atiba return to speak with Ms. Kent following Officer Howard's call to a supervisor. Again, Officer Howard witnessed Ms. Kent in tears and attempting to explain to Defendant Atiba the

pain and distress she was obviously experiencing. However, Officer Howard observed Defendant Atiba raise his voice at Ms. Kent, refuse to let her finish talking, and then threaten Ms. Kent that if she did not stop requesting medical care that she would be moved to the main jail and would not be allowed to return to the Minimum Security area. Defendant Atiba then told Ms. Kent that it would be the WELLPATH/SWCMG staff that would determine if and when Ms. Kent would go to the hospital, and no one else.

Narrative:

> On 07.03.2019 at 1716, I Officer Glenda Howard was assigned to post MS1B as Pod Officer, radio MS-B-Pod. Nurse Jalill came in again once again to see Inmate Kent, Lauren #173295 after I called and explained the situation and spoke with Sergeant T. Hague. Nurse Jalill was unprofessional with Kent. Kent was trying to explain how she was feeling. Kent was in tears. Nurse Jalill raised his voice at Kent. Which upset Kent even more. Nurse Jalill cut Kent's explanation off with a raised voice. Nurse Jalill told Kent that if this behavior continued that she would be moved to the main jail and could not ever again return to Minimum Security. Nurse Jalill also told her that medical staff would determine if Kent went to the hospital. End of report.

185.    Defendant Atiba's threat to Ms. Kent that she would be removed from Minimum Security for seeking medical care further demonstrates the deliberate indifference shown toward her. Instead of providing her with care, she was literally threatened to stop seeking care.

186.    Defendant Atiba reinforcing that it was the WELLPATH/SWCMG medical staff that would determine if Ms. Kent went to an outside medical provider – and not the guards like Officer Howard who had called a supervisor when Defendant Atiba refused medical care earlier that day – further demonstrates the policies and practices of WELLPATH/SWCMG and Collin County in attempting to reduce costs by refusing to transfer inmates in need of emergency medical care to off-site providers as part of WELLPATH/SWCMG's and Collin County's Cost Containment Program.

187.    This threat by Defendant Atiba that he would move Ms. Kent to the main jail is just like what happened to Christina Marziale where the medical staff threatened

her with discipline if she kept coming to the nurse's office to seek prenatal care from a doctor. 18-cv-00086-DPM.

188.    Multiple inmates also wrote grievances on Defendant Atiba for his interaction with and refusal to treat Ms. Kent.

189.    On July 3, 2019 at 14:10:06, Ms. Kent reported the following grievance:

> 07/03/2019  02:10 pm
> ORIGINAL REQUEST:
>     I AM PREGNANT WITH TWINS MAYBE 3 BABIES THOUGH. I HAVE BEEN HERE FOR OVER A MONTH. I HAVE BEEN
>     CRAMPING MORE AND MORE SEVERLY EVERYDAY FOR A WEEK. SPOTTING MORE AND MORE EVERYDAY.
>     TODAY I AM BLEEDING LIKE I AM ON MY PERIOD. I AM 4 AND 1/2 MONTHS. I PUT IN A SICK CALL THAN WENT TO
>     THE NURSE HERE JUST NOW. HE DIDNT TAKE MY VITALS AND WOULDNT EVEN LET ME FINISH MY SENTENCE.
>     HE LOOKED AT ONE BLOODY TISSUE AND TOLD ME TO JUST THROW IT ALL AWAY. I HAD A RED BAG THEY
>     GAVE ME TO COLLECT BLOODY STUFF SO THEY COULD SEE. THE PAD WEARING NOW IS FULL OF BLOOD AND
>     IM CRAMPING VERY VERY BAD. PLEASE I NEED TO GO TO THE DOCTOR. PLEASE THIS ISNT RIGHT

190.    Twenty minutes later, Ms. Kent added the following comment to her grievance:

> 07/03/2019  02:30 pm
> INMATE RESPONSE:
>     PLEASE IM BEGGING YOU I NEED A DOCTOR

191.    Ms. Kent then called Amia Higgins. Ms. Kent was crying and told Ms. Higgins that she was cramping for last couple days, no one at the jail was listening to her, she thought something was wrong with baby, and they were not taking her to doctor or hospital. Ms. Kent explained to Ms. Higgins that the nurses wanted her to saturate multiple pads full of blood before she would receive medical attention.

192.    After this call ended, Ms. Higgins called the Collin County Detention Facility and asked for the supervisor in charge. A woman told Ms. Higgins that the supervisor was not available, and Ms. Higgins demanded to speak to whoever was in charge. Ms. Higgins was then transferred to Lieutenant Brazille, whom she spoke with for around five minutes about Ms. Kent.

193.    Ms. Higgins told Lt. Brazille that she had called when Ms. Kent was arrested and asked for medical services to be provided to Ms. Kent because Ms. Kent was pregnant. Ms. Higgins explained that whoever she spoke with that day told her that Ms. Kent would receive medical attention. Ms. Higgins explained to Lt. Brazille that Ms. Kent had just called her crying hysterically.  Ms. Higgins told Lt. Brazille that Ms. Kent told her she had been cramping for days. Ms. Higgins told Lt. Brazille that someone needed to provide Ms. Kent with medical attention.

194.    Consistent with everyone else who owed a duty to care for and protect Ms. Kent inside of the Collin County Detention Facility, Lt. Brazille was dismissive of Ms. Kent. Lt. Brazille told Ms. Higgins, "you can't believe everything they tell you." Lt. Brazille was inferring that Ms. Kent, like inmates in general, could not be believed when they reached out for medical care. This statement alone is shocking; however, given the disturbing facts of this case – it is unfortunately par for the course for these Defendants and further displayed the culture of deliberate indifference to inmates, and specifically Ms. Kent's medical needs, further demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

195.    Ms. Higgins then explained her relationship with Ms. Kent and that she did not think Ms. Kent was lying. To the contrary, Ms. Higgins explained that she thought something was wrong. Ms. Higgins told Lt. Brazille that she had known Ms. Kent for a long time and had not known Ms. Kent to lie. Ms. Higgins told Lt. Brazille that for Ms. Kent to be calling Ms. Higgins so concerned about her condition – it was obvious that Ms. Kent needed to be seen by a doctor.

196.    This demonstrates that even a layperson would know that Ms. Kent needed medical care as Ms. Higgins is not a trained medical professional but still understood the need to provide Ms. Kent medical attention based off the facts known to her at the time.

197.    Lt. Brazille told Ms. Higgins he was going to get a nurse around there to check on Ms. Kent.

198.    However, Ms. Kent was not admitted into the infirmary on July 3, 2019 until 11:10 p.m. This was **nine hours** after her first grievance **that day** through the kiosk begging for help and around **eight hours** after Amia Higgins contacted the jail demanding medical attention for Ms. Kent as well.

| 2019-BK-08305 | Infirmary Admission | Admission Date/Time | 07/03/2019 2310 | Medina RN, Mary | 07-03-2019 11:15 pm |
|---|---|---|---|---|---|

199.    Despite being admitted into the infirmary as a pregnant woman complaining of bleeding and cramping, Ms. Kent was not provided medical attention or the opportunity to see a doctor. Instead, Ms. Kent was again simply told to **keep a pad count**.

| 2019-BK-08305 | Infirmary Admission | Admission Assessment: | Inmate was brought to the infirmary for complaints of bleeding and cramping. LT called nurse and asked in MS nurse could assess inmate. MS nurse notified LT and LT asked for her to be housed in the infirmary on 23 obs. Inmate stated she has intermittent cramping, pain is 3 1/2. Inmate AO x 4, gait steady. Inmate was advised to keep a pad count and notify the nurse if she started to experience cramping. Inmate verbalized understanding, task placed for P.A. in am. | Medina RN, Mary | 07-03-2019 11:15 pm |
|---|---|---|---|---|---|

200.    On July 4, 2019, Ms. Kent finally saw Defendant Abii for the second time.

201.    Ms. Kent had not seen Defendant Abii since on or about June 6, 2019.

202.    This July 4, 2019 meeting with Defendant Abii was the meeting the WELLPATH/SWCMG staff, including Defendant Atiba and Defendant Michelle, as well

as Officer Compton had instructed Ms. Kent to wait for each time that she requested medical attention.

203.    Ms. Kent was told to wait for this meeting with Defendant Abii because it was the policy and practice of the WELLPATH/SWCMG and Collin County to reduce costs by refusing to transfer inmates in need of emergency medical care to offsite providers as part of WELLPATH/SWCMG's and Collin County's Cost Containment Program.

204.    This July 4, 2019 meeting was Ms. Kent's initial Collin County Obstetrics visit – **thirty-six days after Ms. Kent was booked into the Collin County Jail** and the staff was made aware that she was a pregnant with a high-risk pregnancy.

| 07-04-2019 2:29 pm | INMATE WAS SEEN BY PA TORI FOR HER INITIAL CC OB VIST THIS AM. UA SHOWED UTI. MED ORDERED. 24' PAD COUNT RE-ORDERED. INMATE GIVEN A RED BIO BAG. INMATE HAS BEEN EDUCATED TO INCREASE FLUIDS. URINE WAS CLEAR AND STRAW-COLORED. INMATE VOICED UNDERSTANDING. | Lovelace RN, Betsey | Medical Staff | Medical Note |

205.    In the above notation, PA Tori refers to Defendant Latori Abii.

206.    Defendant Abii took a urine sample from Ms. Kent and determined that Ms. Kent had a severe urinary tract infection.

207.    Had Ms. Kent been given prenatal care that she was requesting, the urinary tract infection would have been found when it first developed.

208.    Had Ms. Kent been given prenatal care that she was requesting, the urinary tract infection would have been treated when it first developed.

209.    Defendant Abii's body language and tone of voice clearly indicated she was disregarding Ms. Kent's pleas for medical attention which was patently apparent due to the obvious distress Ms. Kent was experiencing and the medical issues she had been complaining of to WELLPATH/SWCMG staff and Collin County staff.

210.    Defendant Abii appeared to be completely indifferent to Ms. Kent's concerns.

211.    Defendant Abii even told Ms. Kent that "if she was miscarrying there was no magic pill she could give her to stop the process or reverse it."

212.    However, there was something that could have been done – WELLPATH/SWCMG and Colling County staff could have provided Ms. Kent with medical care when she initially requested it – as any reasonable human would do for another in distress.

213.    However, Defendant Abii still did not provide Ms. Kent with medical attention for her complaints of abdominal pain, abdominal cramping, or vaginal bleeding.

214.    Nor did Defendant Abii provide Ms. Kent with an opportunity to see a doctor.

215.    Defendant Abii ignored the clear and obvious signs that something was wrong with Ms. Kent's pregnancy and made the deliberate choice to do nothing to help Ms. Kent or her unborn child– further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

216.    Instead, Defendant Abii instructed Ms. Kent to **keep a pad count** as was the WELLPATH/SWCMG and Collin County policy and practice to avoid transferring inmates to offsite medical providers.

### Ms. Kent Lost Baby Dakota Due to the Deliberate Indifference to Her Obvious Medical Needs

217.    On July 5, 2019, Defendant Michelle Pounders was the nurse working in the infirmary where Ms. Kent had finally been transferred at 11:10 PM on July 3, 2019.

218.   That day, Ms. Kent again began experiencing severe abdominal cramping and pain, which she relayed to Defendant Pounders.

219.   Defendant Pounders spoke with Defendant Abii regarding Ms. Kent's continued abdominal cramping, abdominal pain, and vaginal bleeding. Defendant Abii instructed Defendant Pounders to have Ms. Kent **continue keeping a pad count**–further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

| 07-05-2019 6:08 pm | This nurse made the call to keep the pt in the infirmary on a 30 minute medical after pt started cramping. Continuing to monitor pad count after consulting PA Tori. | Pounders, Michelle | Medical Staff | Medical Note |
|---|---|---|---|---|

220.   Defendant Abii was deliberately indifferent to Ms. Kent's and Ms. Kent's unborn child's health and safety by continuing to require pad counts instead of providing Ms. Kent with medical care despite knowing that Ms. Kent had been having abdominal pain, abdominal cramping, and vaginal bleeding for a week, Ms. Kent had not received prenatal care since she arrived in the jail on May 30, 2019, Defendant Abii diagnosed Ms. Kent with a severe urinary tract infection the day prior, and Ms. Kent's pregnancy was high risk.

221.   Defendant Abii continued ordering pad counts and refused to provide medical care for Ms. Kent due to WELLPATH/SWCMG and Collin County's Cost Containment Program.

222.   Defendant Abii failed to supervise Defendant Pounders by instructing her to continue monitoring pad counts instead of provide Ms. Kent with medical care.

223.   Ms. Kent was in labor, having very painful cramps, crying, and laying on the cold cement floor of her jail cell. This was a situation no mother should have to endure,

but unfortunately, is the reality for many incarcerated mothers in facilities contracted with Wellpath, Inc. to provide them with medical care.

224.    Defendant Pounders disparaged and belittled Ms. Kent to the officers and other nurses saying Ms. Kent had a history of this sort of behavior and completely disregarded Ms. Kent's obvious distress and cries for help. Defendant Pounders even rolled her eyes at Ms. Kent multiple times. This blatant disregard for another human being in obvious need of medical attention is simply inexplicable.

225.    Defendant Pounders told Ms. Kent to lay down so she could push on Ms. Kent's lower stomach, claiming that she could tell if Ms. Kent was indeed having contractions or not. Defendant Pounders, ignoring obvious signs of medical distress, just told Ms. Kent she was lying and gave Ms. Kent two warm compress packs to "ease the discomfort." Providing Ms. Kent with warm compress packs was clearly and obviously not the type of medical care Ms. Kent required; however, this response did not incur a cost and thus was acceptable under WELLPATH/SWCMG's and Collin County's Cost Containment Program.

226.    Ms. Kent was in excruciating pain for approximately 6-8 hours that day, crying and begging for help.

227.    Just before Ms. Kent gave birth, Defendant Pounders forced her to grab her belongings so that Ms. Kent could be sent back to general population in the main jail. Defendant Pounders made a phone call and told the person on the other end of the line that Ms. Kent was to be re-housed in maximum security and not to send her back to minimum security because Ms. Kent "would just continue to cry wolf" and be sent back to the infirmary with Defendant Pounders – further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating how far WELLPATH/SWCMG and Collin

County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

228.    Defendant Pounders was having Ms. Kent moved out of minimum security for requesting medical attention, just as Defendant Atiba had threatened days prior.

229.    Ms. Kent delivered her child inside of a cold, filthy jail cell in extreme pain and fear. This situation is one of the most inhumane examples of deliberate indifference imaginable – but appears to be the practice and custom of WELLPATH/SWCMG AND Collin County, as is apparent from the other examples noted above with Wellpath, Inc. and the national investigative reports into this issue with Wellpath, Inc. noted above in this lawsuit.

230.    While being forced to transfer to the maximum-security area of the jail for requesting medical care, Ms. Kent rushed back into the cell as she felt she was in labor.

231.    Ms. Kent was screaming and crying out in pain.

232.    Ms. Kent was terrified that her baby was not ready to be born.

233.    Ms. Kent was alone, as that the only people around her had callously ignored her cries for help and refused to provide her with the medical attention for her basic human needs – the care of her and her unborn child.

234.    Ms. Kent delivered her baby while seated over the toilet in her cell.

235.    Ms. Kent's baby, Dakota Lee, was dead.

236.    Ms. Kent was distraught and in an enormous amount of pain – both physically and mentally.

237.    Nurse Janet placed Dakota Lee's body into a red hazard bag and then without any explanation, refused to give it to Ms. Kent to hold as she was mourning the loss of her child. This complete lack of compassion further illustrates the culture of

WELLPATH/SWCMG and Collin County to treat inmates in the Collin County Jail as less than human.

238.   Thankfully, EMS allowed Ms. Kent the opportunity to hold the bag with Dakota Lee inside once they were in the ambulance – which shows there was no valid reason to deny Ms. Kent this opportunity in the first place.

239.   The deliberate indifference shown by Defendant Abii, Defendant Pounders, and Nurse Janet during the delivery of Ms. Kent's child is abhorrent and shows a complete disregard for human life.

240.   Defendant Pounders witnessed Ms. Kent crying out that she thought she going to have her baby and Defendant Pounders observed a significant amount of blood in the toilet beneath Ms. Kent. However, instead of calling for an ambulance, Defendant Pounders called Defendant Abii and advised her of a possible miscarriage.

241.   In response to this information, Defendant Abii disgustingly instructed Defendant Pounders to advise Ms. Kent to **continue a pad count.** Defendant Pounders advised Ms. Kent to do so and noted that **all WELLPATH/SWCMG and Collin County protocols were followed**.

| 07-05-2019 6:20 pm | Pt was observed sitting on the commode crying saying "I feel like I am going to have a baby". This nurse noticed a significant amount of blood in the commode. This nurse called PA Tori to inform her of the findings, a possible miscarriage. Pt was advised to continue pad count, and this nurse was to keep a close eye on the patient. All protocols followed. | Pounders, Michelle | Medical Staff | Medical Note |

242.   Once again, Defendant Abii and Defendant Pounders were following the policy and practice of WELLPATH/SWCMG and Collin County to reduce costs by avoiding offsite transfers of inmates who obviously need emergency medical care. Defendant Abii and Defendant Pounders were admittingly following protocols – further displaying the deliberate indifference to Ms. Kent's medical needs and demonstrating

how far WELLPATH/SWCMG and Collin County's policy would go to avoid the cost of transferring an inmate under the Cost Containment Program.

243.   Once again, Defendant Abii failed to supervise Defendant Pounders by simply ordering her to continue pad counts instead of providing medical care.

244.   Defendant Pounders continued to stand by and watch as Ms. Kent suffered in agonizing pain while the serious and obvious risk to Ms. Kent and her unborn child's health rapidly escalated. Any compassionate person would see this mother's distress and call for medical care; however, following WELLPATH/SWCMG and Colling County protocols, Defendant Pounders and Defendant Abii coldheartedly and cruelly just stood by and continued requiring a pad count before help would be rendered.

245.   It was not until Ms. Kent actually delivered her child in the jail cell and Nurse Janet removed the body from the toilet that an ambulance was finally called.

246.   Apparently at this point, WELLPATH/SWCMG and Collin County protocols finally allowed for off-site transport of Ms. Kent for emergency medical care.

247.   However, astoundingly, even after the pre-term birth of Ms. Kent's child and the transfer to the hospital by an ambulance, Defendant Pounders continued to make note of the pad count. Defendant Pounders wrote in her note that "there were 2 pads with a scant amount of brownish blood, and one pad the pt was wearing to the hospital with a moderate amount of bright red blood," even though Defendant Pounders had just observed "a significant amount of blood in the commode," "significant amount of product in the commode," and Ms. Kent deliver her child.

248.   It is clear that WELLPATH/SWCMG's and Collin County's protocols requiring the pad counts before transferring inmates to off-site medical providers – even in situations necessitating obvious medical emergencies such as with Ms. Kent – were so

engrained in Defendant Pounders that she continued to make note of the pad count even though it did not accurately represent the amount of blood lost by Ms. Kent and observed by Defendant Pounders.

| 07-05-2019 6:30 pm | The pt kept screaming, and this nurse stood with the pt to get an idea of the amount of blood passed. It seems that there was a significant amount of product in the commode. This nurse did not want to make that distinction, so this nurse asked the NP Janet for help. NP Janet called Tori back to explain the situation, and Tori asked that the pt be sent to the Baylor McKinney by ambulance to be seen. At this point, there were 2 pads with a scant amount of brownish blood, and one pad the pt was wearing to the hospital with a moderate amount of bright red blood. Will follow up with Baylor McKinney. | Pounders, Michelle | Medical Staff | Medical Note |

249.    On July 9, 2019, Ms. Higgins sent a text message regarding Ms. Kent, which referenced her call to the jail demanding medical care and the deliberate indifference shown to Ms. Kent in the days leading up to her miscarriage.



250.    There is not a day that goes by that Ms. Kent does not think about Dakota.

251.    The Defendants were at all times acting under the color of law.

**IV.**
**Causes of Action**

**COUNT I**

**DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Atiba, Pounders, Abii, and McBride**

252.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

253.   Pretrial Detainees must rely on jail authorities to treat their medical needs; therefore, the government has an obligation to provide medical care for those whom it is incarcerating.

254.   Ms. Kent had a constitutional right to medical care while incarcerated as a pretrial detainee under the 14th amendment.

255.   A pretrial detainee alleging deliberate indifference must show that "(1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)).

256.   An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

257.   Moreover, deliberate indifference cannot be inferred from "negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.*, 245 F.3d 447, 458-59 (5th Cir. 2001).

258.   Rather, deliberate indifference is shown when a plaintiff properly alleges that officials "refused to treat him ... or engaged in any similar conduct that would clearly

evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

259.   A serious medical need is one for which treatment has been recommended or for which <u>the need is so apparent that even laymen would recognize that care is required</u>. (emphasis added) *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006).

260.   Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994).

261.   Refusing to treat a prisoner's complaints can give rise to Section 1983 liability. *Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018); *Easter*, 467 F.3d at 461–65; *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 n.8. (5th Cir. 2017).

262.   An episodic-acts-or-omissions claim faults specific jail officials for their acts or omissions.

263.   As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge…" *Est. of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463–64 (5th Cir. 2015).

264.   Plaintiff must allege facts demonstrating subjective deliberate indifference, meaning that the Defendants both knew of and disregarded a substantial risk of serious harm.

**Defendant Atiba was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

265.   Defendants Atiba was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Ms. Kent was pregnant, Ms. Kent was in a high-risk pregnancy, Ms. Kent has been complaining of abdominal pain, abdominal cramping, vaginal bleeding, and not feeling her babies move, and Ms. Kent had been complained of these issues for multiple days.

266.   Thus, Defendant Atiba was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant Atiba actually drew that inference.**

267.   Defendant Atiba actually drew this inference because he instructed Ms. Kent to continue her pad count. Further, Defendant Atiba's actually knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Ms. Higgins did when she called to demand Ms. Kent receive care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Atiba actually drew the inference that a substantial risk of serious harm existed.

268.   Accordingly, Defendant Atiba was deliberately indifferent to Ms. Kent because Defendant Atiba "refused to treat [her] … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**Defendant Pounders was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

269.   Defendants Pounders was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Ms. Kent was

pregnant, Ms. Kent was in a high-risk pregnancy, Ms. Kent has been complaining of abdominal pain, abdominal cramping, vaginal bleeding, and not feeling her babies move, and Ms. Kent had been complained of these issues for multiple days.

270.   Thus, Defendant Pounders was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### **Defendant Pounders actually drew that inference.**

271.   Defendant Pounders actually drew this inference because he instructed Ms. Kent to continue her pad count. Further, Defendant Pounders' actually knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Ms. Higgins did when she called to demand Ms. Kent receive care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Pounders actually drew the inference that a substantial risk of serious harm existed.

272.   Accordingly, Defendant Pounders was deliberately indifferent to Ms. Kent because Defendant Pounders "refused to treat [her] … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### **Defendant Abii was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

273.   Defendants Abii was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Ms. Kent was pregnant, Ms. Kent was in a high-risk pregnancy, Ms. Kent has been complaining of abdominal pain, abdominal cramping, vaginal bleeding, and not feeling her babies move, Ms. Kent had

been complained of these issues for multiple days, and Ms. Kent had a Urinary Tract Infection.

274.   Thus, Defendant Abii was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Abii actually drew that inference.

275.   Defendant Abii actually drew this inference because he instructed Ms. Kent to continue her pad count. Further, Defendant Abii's actually knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Ms. Higgins did when she called to demand Ms. Kent receive care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Abii actually drew the inference that a substantial risk of serious harm existed.

276.   Accordingly, Defendant Abii was deliberately indifferent to Ms. Kent because Defendant Abii "refused to treat [her] … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### Defendant McBride was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

277.   Defendants McBride was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Ms. Kent was pregnant, Ms. Kent was in a high-risk pregnancy, Ms. Kent has been complaining of abdominal pain, abdominal cramping, vaginal bleeding, and not feeling her babies move, and Ms. Kent had been complained of these issues for multiple days.

278.   Thus, Defendant McBride was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant McBride actually drew that inference.**

279.   Defendant McBride actually drew this inference because he instructed Ms. Kent to continue her pad count. Further, Defendant McBride's actually knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Ms. Higgins did when she called to demand Ms. Kent receive care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant McBride actually drew the inference that a substantial risk of serious harm existed.

280.   Accordingly, Defendant McBride was deliberately indifferent to Ms. Kent because Defendant McBride "refused to treat [her] … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

281.   As a direct result of the Defendants failing to provide medical care and attention to Ms. Kent, she suffered physical injury, physical pain and suffering, and mental anguish and emotional distress for which she sues herein.

282.   These injuries were not caused by any other means.

283.   The Defendants were at all times acting under the color of law.

## COUNT II

**FAILURE TO SUPERVISE**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendant Abii**

284.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

285.    In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

286.    "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Smith*, 158 F.3d at 912.).

287.    In this case, Defendant Abii failed to supervise Defendants Atiba, Pounders, and McBride.

288.    First, it is clear that Defendant Abii was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and Defendant Abii actually drew the inference that a substantial risk of serious harm existed because Defendant Abii was aware that Ms. Kent was in a high risk pregnancy, Ms. Kent has been complaining of abdominal pain, abdominal cramping, vaginal bleeding, and not feeling her babies move, Ms. Kent had been complained of these issues for multiple days, and Ms. Kent had a Urinary Tract Infection.

289.    However, despite this information, Defendant Abii continued to instruct Defendants Atiba, Pounders, and McBride to simply order pad counts instead of providing Ms. Kent with medical care by a doctor or off-site medical transfer.

290.    As a result, Defendant Abii was deliberately indifferent in failing to supervise Defendants Atiba, Pounders, and McBride.

291.    As a result, her failure to supervise Defendants Atiba, Pounders, and McBride amounted to deliberate indifference.

292.    Finally, there existed a causal link between Cook and Thompson's failure to supervise and the violation of the plaintiffs' rights. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

293.    Had Defendant Abii taken steps to ensure Defendants Atiba, Pounders, and McBride had provided Ms. Kent with medical care instead of simply ordering pad counts, Ms. Kent would not have continued to suffer and ultimately lost baby Dakota.

294.    Defendant Abii's directing Defendants Atiba, Pounders, and McBride to order pad counts instead of provide medical care to Ms. Kent directly caused the harm outlined in this lawsuit to Ms. Kent.

295.    As a result, (1) defendant Abii failed to supervise Defendants Atiba, Pounders, and McBride; (2) a causal link exists between the failure to supervise and the violation of Ms. Kent's rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 911–12).

296.    Defendant Abii was at all times acting under the color of law.

## COUNT III

**PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE**
***Monell v. New York City Department of Social Services***
**Violation of the First and Fourteenth Amendments**
**Pursuant to 42 U.S.C § 1983**
**Defendants Collin County and WELLPATH/SWCMG**

297.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

298.    WELLPATH/SWCMG may be considered as a person acting under color of state law for purposes of § 1983 because it is a private entity performing a state function.

For WELLPATH/SWCMG to be liable under § 1983, Plaintiff must allege facts showing a policy or a custom of Wellpath LLC that caused his injury. See *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691–94 (1978) (stating requirements for pursuing a § 1983 claim against a municipality); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (extending Monell requirements to a private entity performing a state function); *Wabuyabo v. Correct Care Sols.*, 723 F. App'x 642, 643 (10th Cir. 2018) ("[T]o state a claim against CCS, [Plaintiff] must identify an official policy or custom that led to the alleged constitutional violation.").

299.   Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

300.   A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell*, 436 U.S. at 690–91.

301.   Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

302.   "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

303.   The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and

promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

304.   A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

305.   To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks– Fields*, 860 F.3d at 808).

306.   "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Hicks–Fields*, 860 F.3d at 808.

307.   In *City of Oklahoma City*, 471 U.S. at 823, the Supreme Court described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives."

308.   A government entity may incur Section 1983 liability for episodic acts and omissions injurious to a pretrial detainee if plaintiffs first prove that officials, acting with subjective deliberate indifference, violated her constitutional rights; and plaintiffs then establish that the employees' acts resulted from a municipal policy or custom adopted with objective indifference to the detainee's constitutional rights. *Sanchez v. Young Cty., Texas*, 866 F.3d 274, 280 (5th Cir. 2017); *Hare,* 74 F.3d at 649; *Lawson v. Dallas Cty.*,

286 F.3d 257 (5th Cir. 2002) (jail medics' treatment of paraplegic inmate, leading to decubitus ulcers, was subjectively deliberately indifferent, and County was liable for multiple policies indicating objective indifference to serious medical needs).

309.    Thus, Plaintiff invokes alternative theories for Defendants Collin County and WELLPATH/SWCMG' liability: the unconstitutional "conditions of confinement" at the Collin County Jail, or the "episodic acts and omissions" of medical staff at the jail. 312. *Sanchez*, 866 F.3d at 279; *Hare*, 74 F.3d at 644–45.

## **POLICYMAKER**

310.    The Supreme Court has stated that "there will be cases in which policymaking responsibility is shared among more than one official or body." *Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

311.    The Court has also explained that if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *Id.*; *see also King ex rel. Estate of King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Although [a private medical-care provider] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [provider]. In that sense, the county's duty is non-delegable.").

## Collin County

312.    Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James v. Harris Cty,* 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994, 1013 (2003).

313.    The Collin County Sheriff approved the contract with WELLPATH/SWCMG regarding medical care policies at the Jail and was fully aware of its contents.

314.    In an email from then Collin County Sheriff Terry Box on March 24, 2016 at 1:12 PM, Jail Administrator Charles Adams was quoted as stating that their "Offsite costs have been reduced" with regard to the WELLPATH/SWCMG Cost Containment Program.

315.    On November 1, 2018, Greg Roberts, the Collin County Health Services Administrator, sent an email to Collin County Sheriff Jim Skinner, and seventeen other Collin County administrators named in the photograph below. This email was to share information about Wellpath, the merged CMG and CCS company, which had taken over as the medical service provider for SWCMG following the merger.

From: Greg Roberts <greg.roberts@cmgcos.com>
Sent: Thursday, November 1, 2018 4:30 PM
To: James Skinner <jskinner@co.collin.tx.us>; Terry McCraw <tmccraw@co.collin.tx.us>; Bryce Thompson <bthompson@co.collin.tx.us>; Gerard Klahr <gklahr@co.collin.tx.us>; David Barnett <dbarnett@co.collin.tx.us>; Kelley Stone <kstone@co.collin.tx.us>; Matt Langan <mlangan@co.collin.tx.us>; Jimmy Moody <jmoody@co.collin.tx.us>; Michael Sepulvado <msepulvado@co.collin.tx.us>; Christopher Perepiczka <cperepiczka@co.collin.tx.us>; Chris Barnes <cbarnes@co.collin.tx.us>; Anne Sibley <asibley@co.collin.tx.us>; Hiram Lynn Hadnot <hhadnot@co.collin.tx.us>; Michael King <mking@co.collin.tx.us>; Alyse Ferguson <aferguson@co.collin.tx.us>; Candy Blair <cblair@co.collin.tx.us>; Candice Akins <cakins@co.collin.tx.us>; Michelle Chamoski <mchamoski@co.collin.tx.us>
Subject: Wellpath, the new CCS-CMGC

Partners,

I wanted to share the attached brochure with each of you that has some information about Wellpath, the merged CMG and CCS company. I don't expect any significant changes in our functionality or the ability to deliver quality services to our facilities at Collin County. I remain committed to our partnership and to the successful delivery of quality Adult and Juvenile healthcare. Please always let me know how we can be better and thank you for your continued confidence and support.

Greg Roberts, RN, CCHP
Health Services Administrator
Wellpath, Your Correctional Healthcare Provider
Collin County Detention Facility
4300 Community Blvd
McKinney, TX 75071
972-547-5296 office
469-989-8371 mobile

316.    The Collin County sheriff had been delegated policy-making authority by the Collin County Commissioner's Court.

317.    Additionally, on August 17, 2015, the Collin County Commissioner's Court, made up of Keith Self, the Presiding County Judge, Susan Fletcher, County Commissioner for Precinct 1, Cheryl Williams, County Commissioner for Precinct 2, Chris Hill, County Commissioner for Precinct 3, and Duncan Webb, County Commissioner for Precinct 4, which were the policymakers for Collin County, all approved the award of Services, Inmate Health Care (RFP No. 2015-122) to WELLPATH/SWCMG.

COURT ORDER NO. 2015- 530                    -08-17

THE STATE OF TEXAS

COUNTY OF COLLIN

Subject:  Award, Services, Inmate Health Care - Sheriff

On **August 17, 2015,** the Commissioners Court of Collin County, Texas, met in **regular session** with the following members present and participating, to wit:

| | |
|---|---|
| Keith Self | County Judge, Presiding |
| Susan Fletcher | Commissioner, Precinct 1 |
| Cheryl Williams | Commissioner, Precinct 2 |
| Chris Hill | Commissioner, Precinct 3 |
| Duncan Webb | Commissioner, Precinct 4 |

During such session the court considered a request for approval to award Services, Inmate Health Care (RFP No. 2015-122).

Thereupon, a motion was made, seconded and carried with a majority vote of the court for approval to award Services, Inmate Health Care (RFP No. 2015-122) to **South West Correctional Medical Group, Inc.**  Same is hereby approved in accordance with the attached documentation.

Keith Self, County Judge

Susan Fletcher, Commissioner, Pct. 1

Cheryl Williams, Commissioner, Pct. 2

Chris Hill, Commissioner, Pct. 3

ATTEST:

Duncan Webb, Commissioner, Pct. 4

Stacey Kemp, Ex-Officio Clerk
Commissioners Court
Collin County, T E X A S

\\ccdata01\Commissioner Court\shephardge\1\Word Data\Court 2015\COURT ORDERS\08-17-15 Court\Signed\40266 - Services, Inmate Health Care 0817.doc

318.     Thus, the Collin County Commissioner's Court chose WELLPATH/SWCMG based off the proposals made by WELLPATH/SWCMG outlining the Cost Containment Program.

319.     The Sheriff was directly involved with implementing each of the Collin County Sheriff's Department policies and practices, which as discussed in this lawsuit adopted the WELLPATH/SWCMG policies and practices and were created in conjunction with the WELLPATH/SWCMG policies and practices, including but not limited to the Cost Containment Program; accordingly, he had actual knowledge of each.

320.     Additionally, the Collin County Sheriff had constructive knowledge of the failure to provide adequate medical care under the Cost Containment Program and related policies and practices, as the Collin County Sheriff would have known of these practices in the department had he exercised his responsibilities, especially with regard to overseeing transporting of inmates and providing security to said inmates at off-site medical facilities. *Hicks–Fields,* 860 F.3d at 808.

### WELLPATH/SWCMG

321.     WELLPATH/SWCMG was also a policymaker responsible for the medical care policies complained of in this lawsuit. *Praprotnik*, 485 U.S. at 126.

322.     In the *Request for Proposal for Services, Inmate Health Care* (RFP) sent by Collin County to WELLPATH/SWCMG, the following provisions delegate policymaking authority to the medical care provider, which ultimately ended up being WELLPATH/SWCMG after they were chosen for their ability to reduce costs under their Cost Containment Program.

323.   In Provision 6.24 of the RFP, it states that the **polices and procedures** of the Provider (WELLPATH/SWCMG) **relating to medical care** are generally to be **established and implemented solely by the Provider** (WELLPATH/SWCMG).

6.24  Policies and procedures of the Provider relating to medical care are generally to be established and implemented solely by the Provider in accordance with OSHA Guidelines and Texas Senate Bill 959 Workplace Guidelines, Chapter 1195 Vernon's Texas Statutes.  In areas which impact upon security and general administration of Collin County Detention Facilities, the policies and procedures of the Provider are subject to the review and approval of the Collin County Sheriff/Director of Juvenile Probation.  Without limiting the responsibility of the Provider to make their own medical health, mental health, and dental health judgments, or the discretion of the Collin County Sheriff/Director of Juvenile Probation to perform his responsibilities under law, those areas are as follows:

- Drug and syringe security;
- Alcohol and drug medical detoxification;
- Identification, care and treatment of residents with special medical needs, including but not limited to, individuals with hepatitis, epilepsy, physical handicaps, those infected with HIV, and those with any other disease that can be sexually transmitted;
- Suicide prevention;
- The use of physical restraints; and
- Identification, care and treatment of individuals suffering from any mental illness, disease or injury, including but not limited to, those inmates presenting a danger to themselves and others.

324.   In Provision 6.72 of the RFP, it states that the Provider (WELLPATH/SWCMG) shall specify policies and procedures and that the Provider (WELLPATH/SWCMG) is responsible for ensuring a copy of their policies and procedures is provided to Collin County.

6.73  Provider shall specify the policies and procedures to be followed in responding to inmate/juvenile complaints relating to any aspect of the health care provided during incarceration at the Collin County Detention Facilities.  Said policies and procedures shall also address the means by which Provider will respond to medically-related allegations contained in lawsuits filed by inmates/juveniles. Provider is responsible to ensure that a copy or provider's policy and procedures and all updates be provided to the Collin County Health Care Administrator.

325.   In Provision 6.61 of the RFP, it states that the Provider (WELLPATH/SWCMG) and Collin County will meet at a minimum on a monthly basis to discuss health care policies and procedures.

6.61   Provider on-site Medical Director, Health Administrator, as well as Provider regional representative, as needed, and any other management representative, as needed, as Collin County deems necessary shall meet at a minimum on a monthly basis with Collin County Jail Administrator/Director of Juvenile Probation, Collin County Health Care Services Director or designee and any other representative as deemed necessary to discuss health care policies, procedures, problems, schedules, cures, etc.  Schedule of review meetings will be established by the Collin County Jail Administrator/Director of Juvenile Probation.

326.    This demonstrates that both WELLPATH/SWCMG and Collin County were creating the policies and were jointly acting as policymakers. *Praprotnik*, 485 U.S. at 126.

327.    Additionally, Provision 6.46 of the RFP states that **the policies and procedures regarding the <u>transportation of inmates for medical reasons</u> will be mutually developed by Collin County and the Provider (WELLPATH/SWCMG)**.

6.46   To the extent any inmate/juvenile requires off-site health care treatment (general hospitalization, specialty services, etc.) Collin County will provide appropriate routine non-emergency transportation services including reasonable security, as requested by Provider. Emergency ambulance transportation of inmates/ juveniles, as directed by Provider personnel, will be provided and paid by Collin County.  Policies and procedures regarding the transportation of inmates/juveniles for medical reasons will be mutually developed by Collin County and Provider within thirty (30) days of contract start date.  The policies shall be approved by the Collin County Jail Administrator/Director of Juvenile Probation.

328.    Thus, the polices and procedures being complained of in this lawsuit were being mutually developed by Collin County and WELLPATH/SWCMG and policymaking responsibility is shared among both bodies. *Praprotnik*, 485 U.S. at 126.

### Policy, Custom, and Practice
### Which was Moving Force of Constitutional Violations

329.    The § 1983 causation component requires that the plaintiff identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly

consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id.*

330.   This Cost Containment Program and all policies and practices described herein that further the Cost Containment Program were unconstitutional practices that prevented Ms. Kent from receiving the medical care she obviously needed, resulting in the death of her unborn child.

331.   In *City of Oklahoma City*, 471 U.S. at 823, the Supreme Court described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives."

332.   The decision by Collin County to outsource the medical care of detainees under a contract with WELLPATH/SWCMG, with the goal of reducing off-site medical care costs and the knowledge that WELLPATH/SWCMG was going to actively prohibit off-site medical care to further that goal, was exactly that.

## Policy, Custom, Practice, and Culture of Reducing Costs by Denying Necessary Medical Care

333.   Collin County and WELLPATH/SWCMG created a culture of constitutional violations through incentivizing the refusal to transport inmates, especially indigent inmates such as Ms. Kent, to off-site medical providers despite the obvious need, in an effort to reduce costs and save the County money.

334.   Through the policies outlined above, Collin County and WELLPATH/SWCMG encouraged and incentivized its medical provider to reduce costs by denying necessary medical care, knowing that the likely results would be harm to inmates being denied said care.

335.    The Health Services Agreement that was entered into by Defendant Collin County, Texas and WELLPATH/SWCMG clearly made a deliberate choice and knew that the policies, practices and customs do not provide for adequate medical care for Collin County inmates, such as Ms. Kent.

336.    The level of medical care provided by Collin County and WELLPATH/SWCMG, including but not limited to failing to provide pregnant women with adequate medical care or transport inmates to off-site medical facilities, at the Collin County Jail was so inadequate that it resulted in a serious deprivation of Ms. Kent's basic human needs, and that the level of care provided was not reasonably related to a legitimate governmental objective. Simply ordering that Ms. Kent continue to keep pad counts, was clearly not adequate medical care and denied her basic human needs. Ms. Kent never saw a physician. There was no legitimate government interest in denying Ms. Kent adequate medical care.

337.    Both WELLPATH/SWCMG's Cost Containment Program, which was adopted by Collin County and required nurses in the jail to refuse, deny, and avoid transferring inmates to offsite medical providers for the purpose of reducing costs, along with the WELLPATH/SWCMG protocols which were adopted by Collin County requiring pregnant women in clear and obvious medical distress to soak two pads full of blood before being given medical care, which helped further the goal of the Cost Containment Program, directly caused Ms. Kent to receive no medical care, to suffer in excruciating pain, and ultimately to lose her baby.

338.    Further, pursuant to WELLPATH/SWCMG and Collin County policy, WELLPATH/SWCMG's staff determines what qualified as a medical emergency necessitating transport of the inmate to off-site medical care, and WELLPATH/SWCMG's

and Collin's County's policy only defines emergency medical care as "life or limb threatening illness or injury." Therefore, if the WELLPATH/SWCMG staff does not determine that the inmate is about to lose their life or limb, then it does not qualify as an emergency medical care situation under WELLPATH/SWCMG's and Collin County's policy and transport to offsite medical care will be denied, pursuant to the Cost Containment Program. These were more policies working to keep costs down pursuant to said Cost Containment Program.

339.    Collin County continually worked with WELLPATH/SWCMG in creating, maintain, and reviewing, and amending policies, as well as approved WELLPATH/SWCMG policies, which establishes that WELLPATH/SWCMG's policies were Collin County's Policies – including the Cost Containment Program.

340.    Plaintiff has plead detailed facts above, relevant to inadequate medical care, which are incorporated as if set-out fully herein which support:

     a.  Official policies, longstanding practices and/or customs existed for WELLPATH/SWCMG in relation to the Collin County Jail which were implemented by the final policymaking officials for WELLPATH/SWCMG who entered into the Health Services Agreement with Collin County, Texas.

     b.  policymakers for WELLPATH/SWCMG knew or should have known about the policies and/or customs;

     c.  the policymakers for WELLPATH/SWCMG were deliberately indifferent; and

     d.  WELLPATH/SWCMG AND Collin County's policies and/or customs were the moving force leading to the constitutional violation being the failure to

provide adequate medical care for Ms. Kent causing her injury and the death of her unborn child.

341.    Plaintiff has pleaded facts to support that Defendants Collin County and WELLPATH/SWCMG were deliberately indifferent because they disregarded known or obvious consequence of their actions. Defendants Collin County and WELLPATH/SWCMG clearly knew of the policies as evidenced by the Health Services Agreement, and knew that these policies were likely to cause constitutianl violations by way of the obvious nature of refusing off-site medical care as well as the numerous lawsuits and national investigative reports done on this very issue.

342.    Collin County and WELLPATH/SWCMG encouraged and incentivized the medical providers to reduce costs by denying necessary medical care through the policies and practices, which include but are not limited to:

a.  The Cost Containment Program and the way that all of the policies named in this lawsuit interacted with one another within the Cost Containment Program;

b.  Explicitly requesting WELLPATH/SWCMG reduce costs by reducing off-site medical transfers;

c.  Giving the most weight in the selection process to WELLPATH/SWCMG's ability to reduce costs over WELLPATH/SWCMG's quality of care;

d.  Choosing WELLPATH/SWCMG to provide medical services at the Collin County Jail because WELLPATH/SWCMG promised to reduce costs by reducing off-site medical transfers;

e.  Providing contract extensions to WELLPATH/SWCMG for reducing costs by reducing off-site medical transfers;

f.  Providing compensation escalators to WELLPATH/SWCMG for reducing costs by reducing off-site medical transfers;

g.  Providing per diem payments on top of the annual base rate to WELLPATH/SWCMG for increased numbers of inmates in the Collin County Jail and Juvenile Facility;

h.  Explicitly stating in the Health Services Agreement that WELLPATH/SWCMG would not be responsible for off-site medical care and that off-site medical care would only be paid after exhausting third party health insurance providers, which means WELLPATH/SWCMG was incentivized not to transfer for off-sitemedical care indigent inmates without health insurance so as not to increase costs on Collin County and thereby increase WELLPATH/SWCMG's likelihood of getting contract extensions and compensation escalators;

i.  WELLPATH/SWCMG's staff determining what qualifies as a medical emergency necessitating transport of the inmate to off-site medical care, and WELLPATH/SWCMG's and Collin's County's policy only defining emergency medical care as "life or limb threatening illness or injury." Therefore, if the WELLPATH/SWCMG staff does not determine that the inmate is about to lose their life or limb, then it does not qualify as an emergency medical care situation under WELLPATH/SWCMG's and Collin County's policy and transport to offsite medical care will be denied, pursuant to the Cost Containment Program;

j.  The policy that inmates would not receive fees for "true medical emergencies as determined by medical staff." The policy further explained,

"Note that emergency medical care is defined as "life or limb threatening illness or injury." This policy incentivized WELLPATH/SWCMG staff to refuse to find a "true medical emergency" so that the inmates would bear the costs – as was told to Ms. Kent when she was requesting medical care;

k. Requiring pregnant women in clear and obvious medical distress to soak two pads full of blood before being given medical care, which helped further the goal of the Cost Containment Program;

l. WELLPATH/SWCMG's and Collin County policy incentivizing the refusing to provide off-site medical care for indigent inmates without health insurance since WELLPAHT/SWCMG and Collin County would bear the costs.

343. It is clear that the harmful effects of all of Collin County's and WELLPATH/SWCMG's policies and practices exacerbated the harmful effects of each other.

344. This Court is not required to consider each policy or practice in a vacuum but may instead properly consider how each individual policy or practice interacts with one another within the larger system Collin County and WELLPATH/SWCMG put together and how the harmful effects of many of Collin County's and WELLPATH/SWCMG policies are exacerbated by others. *M. D. by Stukenberg*, 907 F.3d at 255; *See Piotrowski*, 237 F.3d at 580.

345. As a result of these unconstitutional policies, practices, and customs, Ms. Kent suffered physical pain and suffering and mental anguish for over a week which led to the death of her unborn child.

346. These injuries were not caused by any other means.

## V.
## __PUNITIVE DAMAGES__

347.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

348.   When viewed objectively from the standpoint of the Individual Defendants, at the time of the occurrence, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

349.   As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Individual Defendants, Plaintiff is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## __DAMAGES__

350.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

351.   Plaintiff's injuries were a foreseeable event. Those injuries were directly and proximately caused by the Defendants' deliberate indifference shown toward Plaintiff and their unconstitutional policies applied against Plaintiff.

352.   As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Plaintiff's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against the Individual Defendants.

353.   As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff was forced to suffer:

     a.   Physical injuries;
     b.   Physical pain and suffering;
     c.   Emotional distress, torment, and mental anguish; and

      d.  Medical Expenses.

354.   Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

355.   If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

356.   Plaintiff respectfully requests a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which she may show herself justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF