UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| LAUREN KENT | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-412-SDJ |
| | § | |
| COLLIN COUNTY, TEXAS, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

In this Section 1983 action, Plaintiff Lauren Kent alleges that Defendants
Collin County, Texas; Wellpath, LLC f/k/a Southwest Corrections Medical Group, Inc.
("Wellpath"); Southwest Corrections Medical Group, Inc. ("SCMG"); Jelil Atiba;
Latori Abii; Michelle Pounders; and Julia McBride violated her Fourteenth
Amendment right to medical care while she was detained as an inmate at the Collin
County Jail. Before the Court is Collin County's Motion to Dismiss. (Dkt. #30). Kent
has responded in opposition, (Dkt. #35), and Collin County has filed a reply in support
of its motion, (Dkt. #36). Having considered Collin County's dismissal motion, the
parties' briefing, and the applicable law, the Court concludes that the motion should
be **DENIED**.

### I. BACKGROUND

Kent brings this lawsuit against Collin County, Wellpath[1] (a private company
that contracted with Collin County to provide medical care at its jail), and four

---

[1] According to Kent's complaint, Wellpath is a private contractor and the largest
correctional health care provider in the country. (Dkt. #2 ¶ 13). Wellpath purchased SCMG,
the company that contracted with Collin County to provide medical services at its jail, prior
to the events giving rise to this lawsuit. (Dkt. #2 ¶¶ 13–14, 36–37). For purposes of this
Memorandum Opinion and Order, Wellpath and SCMG are referred to collectively as
"Wellpath."

Wellpath employees who provided medical services at the jail: Physician Assistant Abii, Nurse Atiba, Nurse Pounders, and Nurse McBride. She alleges that the failure of Collin County, Wellpath, and these medical professionals to provide her proper prenatal care caused her to suffer a miscarriage resulting in the death of her unborn child. In support of her claims, Kent alleges the following facts.[2]

### A. Collin County's Health Services Agreement with Wellpath

Prior to the events giving rise to this lawsuit, Collin County decided to outsource medical care of detainees at its jail to a private health care provider. During the bidding process for the contract to provide medical services at the jail, Wellpath proposed the "Cost Containment Program." (Dkt. #2 ¶ 25). This program is designed

---

[2] In deciding Collin County's Rule 12(b)(6) motion, the Court construes Kent's complaint in the light most favorable to her, accepts all well-pleaded factual allegations, and draws all reasonable inferences in her favor. *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). At this stage, the Court's "inquiry is limited to . . . (1) the facts set forth in the complaint, (2) [the] documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). The Court may also consider documents attached to the motion to dismiss that are referenced in the complaint and are central to Kent's claims. *Id.* The following documents are attached to Collin County's motion to dismiss: (1) the Health Services Agreement under which Wellpath provided medical services at the Collin County Jail; (2) Kent's kiosk requests for medical attention and other items; (3) excerpts of Kent's medical records; and (4) an incident report filed by a detention pod officer. (Dkt. #30-1, #30-2, #30-3, #30-4). Because Kent refers to these documents in her complaint and they are central to her claims, the Court will consider them in determining whether to grant Collin County's Rule 12(b)(6) motion. *See Walker*, 938 F.3d at 735.

Also attached to Collin County's dismissal motion is its inmate handbook for the jail. (Dkt. #30-5). Kent does not refer to this document in her complaint. As Collin County points out, the inmate handbook might contain matters of which a court may take judicial notice under Federal Rule of Evidence 201. But the relevant disclaimer from this document—that "INMATES WILL ALWAYS BE GIVEN PROPER MEDICAL CARE REGARDLESS OF FINANCIAL STATUS"—also exists in Kent's medical records, *see* (Dkt. #30-3 at 10), which the Court is considering. Thus, the Court need not and will not consider Collin County's inmate handbook in reaching its decision. *See Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (explaining that a district court has "complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion" (quotation omitted)).

to decrease costs by optimizing onsite medical care, which significantly reduces offsite transport and offsite medical care. (Dkt. #2 ¶ 28). The idea was well received by Collin County, which indicated that it "would like to minimize transport offsite" and was "looking [for] good options to keep the inmates onsite rather than going to the hospital." (Dkt. #2 ¶¶ 52–53). And Collin County ultimately chose Wellpath to provide medical services at the jail because of its promise to reduce costs through this program. (Dkt. #2 ¶¶ 29, 56). In fact, Collin County's desire to eliminate as much offsite medical care as possible was memorialized in the Health Care Services Agreement that it entered into with Wellpath. (Dkt. #2 ¶ 54).

As part of the Cost Containment Program, Wellpath's practice at the Collin County jail allegedly was to deny inmates offsite transport for emergency medical care. (Dkt. #2 ¶ 30). To that end, Wellpath restricted transport offsite to only medical emergencies. (Dkt. #2 ¶ 32). Wellpath defined emergency medical care as "life or limb threatening illness or injury" and granted medical staff discretion to determine what qualifies as a medical emergency necessitating transport of an inmate to offsite medical care. (Dkt. #2 ¶¶ 31–32). The Health Services Agreement allegedly created financial incentives—through housing-based per diem payments, compensation escalators, and the possibility of contract extensions—for Wellpath to reduce Collin County's expenses and costs by denying inmates offsite transport for medical care. (Dkt. #2 ¶¶ 58–67, 84–87).

Kent entered the Collin County Jail against this backdrop.

**B. Kent's Medical Care in the Collin County Jail**

On May 30, 2019, when she was approximately three and a half months pregnant with twins, Kent was arrested and detained at the jail. (Dkt. #2 ¶¶ 88, 95). At booking, Kent informed jail personnel that she was pregnant with twins. (Dkt. #2 ¶¶ 90–91). Abii, a physician assistant, administered a pregnancy test that confirmed Kent's pregnancy that same day. (Dkt. #2 ¶ 93). About a week later, Kent met with Abii. (Dkt. #2 ¶ 96). Kent informed Abii that she was considered a high-risk pregnancy. (Dkt. #2 ¶ 97). Abii noted the absence of any vaginal bleeding, placed Kent on a pregnancy diet, put her on the chronic care list, gave her a bottom bunk designation, completed a medical flag form that was delivered to jail personnel, and scheduled her for an appointment in one month. (Dkt. #2 ¶¶ 98, 101, 103).

Following her appointment with Abii, Kent began to experience abdominal pain, abdominal cramping, and vaginal bleeding. (Dkt. #2 ¶ 106). Over the next four weeks, Kent continued to experience these symptoms, became increasingly concerned about her pregnancy, and asked to see a doctor almost every day. *See, e.g.*, (Dkt. #2 ¶¶ 104, 107, 111, 118, 137). On June 22, 2019, for example, Kent used the jail kiosk to send the following message to medical staff:

> THERE IS A POSSIBILITY THAT I AM FURTHER ALONG IN MY PREGNANCY. I DONT KNOW. I HAVENT ONCE BEEN TO THE DOCTOR. IVE JUST BEEN TO THE ER TWICE. BEFORE I WAS AR[R]ES[]TED I WAS FINALLY APPROVED FOR MEDICADE AND HAD I DOCTORS APPOINTMENT LINED UP. I AM BIG ENOUGH TO BE 6 TO 7 MONTHS PREGNANT. I AM HOPING IM ONLY 4 MONTHS. I KNOW FOR SURE THAT I GOT TWO BABIES IN ME. I FEEL I NEEDED TO LET YOU KNOW THIS. . . . IM VERY WORRIED ABOUT THE HEALTH OF MY BABIES INSIDE ME.

(Dkt. #2 ¶ 133). At this point, Kent had been in jail for twenty-four days and had not seen a doctor. *See* (Dkt. #2 ¶¶ 105, 136).

Kent's condition continued to decline. On June 27, 2019, at 3:47 p.m., Kent notified medical staff that she was experiencing severe abdominal pain and observed "mucus blood stuff" when she used the restroom. (Dkt. #2 ¶ 137). At some point that day, medical staff assessed Kent, noted no "signs of life threatening bleeding," and indicated that they would continue to monitor. (Dkt. #30-3 at 8). Medical staff later responded to Kent's kiosk message, stating, "as the nurse instructed you, please keep a pad count. [I]nform POD Ofc you have something to give medical and they will call us. Thank you." (Dkt. #2 ¶ 138).

This instruction to keep a pad count, Kent alleges, is alluding to the "24-hour pad count" that Wellpath staff repeatedly told her she must keep to prove she was bleeding enough to necessitate emergency medical care. (Dkt. #2 ¶¶ 139–40). Wellpath medical staff, including Atiba and Pounders, advised Kent that she must saturate multiple pads with blood to receive the prenatal medical care she was requesting. (Dkt. #2 ¶ 142). They allegedly told Kent that "if they did not see the blood, then it did not happen." (Dkt. #2 ¶ 143).

Later on June 27, Kent addressed a request sent through the kiosk to Lieutenant McCullough or Sergeant Compton (who appears to be one of the supervising officers at the jail), notifying them that she was pregnant with twins and concerned about the amount of care she was receiving. (Dkt. #2 ¶ 147). After three days passed, Kent sent a follow-up message: "PLEASE DONT FORGET ABOUT ME.

THANK YOU." (Dkt. #2 ¶ 149). After Kent sent this message, she met with Sergeant Compton in person. (Dkt. #2 ¶ 151). During that meeting, Kent informed Sergeant Compton that she was highly concerned for the welfare of her unborn children because she was experiencing abdominal pain, abdominal cramping, and vaginal bleeding and was not receiving adequate medical care. (Dkt. #2 ¶ 152). Sergeant Compton advised Kent to wait until her July 4 appointment with Abii to discuss her medical concerns and to notify a pod officer if she felt she was having medical issues or an emergency. (Dkt. #2 ¶¶ 150, 154–55). At this point, Kent had been in jail for a month, had requested to see a doctor almost every day, and had not yet seen a doctor. *See* (Dkt. #2 ¶¶ 104–05).

On July 3, 2019, Kent submitted several kiosk requests for medical care. In the first message, she informed Wellpath medical staff that she had "been cramping all week," that it was "really bad today," and that she had "collected the bloody pads" for them. (Dkt. #2 ¶ 164). Thirty minutes later, she sent the following message:

> I AM PREGNANT WITH TWINS MAYBE 3 BABIES THOUGH. I HAVE BEEN HERE FOR OVER A MONTH. I HAVE BEEN CRAMPING MORE AND MORE SEVER[E]LY EVERYDAY FOR A WEEK. SPOTTING MORE AND MORE EVERYDAY. TODAY I AM BLEEDING LIKE I AM ON MY PERIOD. I AM 4 AND 1/2 MONTHS. I PUT IN A SICK CALL THAN WENT TO THE NURSE HERE JUST NOW. HE DIDNT TAKE MY VITALS AND WOULDNT EVEN LET ME FINISH MY SENTENCE. HE LOOKED AT ONE BLOODY TISSUE AND TOLD ME TO JUST THROW IT ALL AWAY. I HAD A RED BAG THEY GAVE ME TO COLLECT BLOODY STUFF SO THEY COULD SEE. THE PAD WEARING NOW IS FULL OF BLOOD AND IM CRAMPING VERY VERY BAD. PLEASE I NEED TO GO TO THE DOCTOR. PLEASE THIS ISNT RIGHT[.]

(Dkt. #2 ¶ 189). And twenty minutes after that, she added, "PLEASE IM BEGGING YOU I NEED A DOCTOR." (Dkt. #2 ¶ 190). McBride responded by informing Kent that she had already been seen by the "morning nurse," that Kent had not complied with the 24-hour pad count requirement, and that her issues were more behavioral than medical. (Dkt. #2 ¶ 165). Kent was, once again, advised that she would not receive the requested medical care unless she saturated more than two pads with blood. (Dkt. #2 ¶¶ 165, 170).

The morning nurse referenced in Kent's kiosk message and McBride's response was Atiba. (Dkt. #2 ¶¶ 166, 168). A pod officer who observed the interaction between Atiba and Kent on the morning of July 3 submitted two incident reports. (Dkt. #2 ¶ 180). In the first report, the officer described how Kent was in tears when she explained to Atiba that she had been cramping constantly for a week and spotting vaginal blood and was now bleeding heavily as if she was on her menstrual cycle. (Dkt. #2 ¶ 181). The officer added that Kent said she had not felt her babies move in twenty-four to thirty-six hours and that she had placed sick calls all week about her declining condition. (Dkt. #2 ¶ 182). After the officer explained the situation to his supervisor, Atiba returned to speak with Kent again. This time Atiba raised his voice at Kent, refused to let her finish talking, and threatened to move her to the main jail and not allow her to return to minimum security if she continued to request medical care. (Dkt. #2 ¶ 184). Atiba also told Kent, who was upset and in tears, that medical staff would determine whether she went to the hospital. (Dkt. #2 ¶ 184).

At 11:10 p.m., Kent was admitted to the jail infirmary. (Dkt. #2 ¶ 198). She did not see a doctor, but she was told to keep a pad count. (Dkt. #2 ¶ 199). Medical chart notes indicate that, about an hour later, Kent was "observed sitting up on [a] pallet on the floor reading" with no signs of distress. (Dkt. #30-3 at 8). Only four minutes after that, however, Kent reported "having constant pains" and said she "just got a sharp one that lasted a couple of minutes." (Dkt. #30-3 at 8). Ultimately, according to the medical chart notes, Kent stated that she was feeling "a little better now" and walked back to her cell. (Dkt. #30-3 at 8–9).

Later that morning—thirty-six days after she was booked into the jail—Kent saw Abii for her initial obstetrics visit. (Dkt. #2 ¶¶ 204–05). Abii took a urine sample, which revealed that Kent had a severe urinary tract infection. (Dkt. #2 ¶ 206). Kent expressed concerns about her pregnancy and the issues she was experiencing, but Abii told her that "if she was miscarrying there was no magic pill she could give her to stop the process or reverse it." (Dkt. #2 ¶¶ 210–11). Abii instructed Kent to keep a pad count. (Dkt. #2 ¶ 216); (Dkt. #30-3 at 9).

On July 5, 2019, at approximately 6:08 p.m., Kent informed the nurse working in the infirmary at the time, Pounders, that she was experiencing severe abdominal cramping and pain. (Dkt. #2 ¶¶ 218–19). Pounders consulted with Abii about Kent's abdominal cramping, abdominal pain, and vaginal bleeding. (Dkt. #2 ¶ 219). Abii instructed Pounders to continue monitoring Kent's pad count. (Dkt. #2 ¶ 219). While Kent's cramping worsened, Pounders allegedly disparaged and belittled her, rolled her eyes multiple times, and told nearby officers and nurses that Kent had a history

8

of this sort of behavior. (Dkt. #2 ¶ 224). Pounders then had Kent lay down on her back, placed two warm compresses on her stomach, and palpated her stomach to check for contractions. (Dkt. #2 ¶ 225). According to medical notes, Pounders did not feel any contractions and instructed Kent to continue to keep a pad count. (Dkt. #30-3 at 9).

At approximately 6:20 p.m., Pounders observed Kent sitting on the toilet and yelling that she thought she was going to have her baby. (Dkt. #2 ¶ 240). Kent, while screaming and crying out in pain, delivered her baby while seated over the toilet. (Dkt. #2 ¶ 231–34). The baby was dead. (Dkt. #2 ¶ 235). Pounders noticed a significant amount of blood in the toilet beneath Kent and called Abii to inform her of a possible miscarriage. (Dkt. #2 ¶¶ 240–41). Consistent with Abii's instructions, Pounders advised Kent to continue a pad count. (Dkt. #2 ¶ 241). According to Pounder's notes, all protocols were followed. (Dkt. #2 ¶ 241). After that, medical staff removed the baby's body from the toilet, called an ambulance, and transferred Kent to a hospital for evaluation. (Dkt. #2 ¶ 245); (Dkt. #30-3 at 9).

## C. Kent's Lawsuit and Collin County's Motion to Dismiss

Kent later filed this lawsuit against Collin County, Wellpath, Abii, Atiba, Pounders, and McBride. She asserts claims under 42 U.S.C. § 1983 for deliberate indifference against all the individual defendants and for failure to supervise against Abii. Relevant here, she alleges that these individuals acted pursuant to the "Cost Containment Program," a policy adopted by Collin County at the jail to reduce expenses by avoiding and refusing the transfer of inmates who need emergency medical care to outside medical providers. Based on this alleged policy, Kent brings

Section 1983 claims for municipal liability against Collin County and Wellpath. Collin County now moves to dismiss Kent's complaint under Rule 12(b)(6).

## II. Legal Standard

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [her] claims . . . across the line from conceivable to plausible," a court draws on its own common sense and judicial experience. *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## III. Discussion

Collin County makes two principal arguments in its dismissal motion. First, it argues that it is "immune" from liability under Section 1983 because Kent has not alleged that a Collin County employee—as opposed to a Wellpath employee—violated her constitutional right to adequate medical care. (Dkt. #30 at 29). Second, Collin

County contends that Kent has failed to plausibly allege any of the required elements for her Section 1983-based municipal liability claim. After setting forth the governing legal principles, the Court addresses Collin County's arguments in turn.

## A. Section 1983-Based Municipal Liability

A municipality is a "person" subject to liability under Section 1983 for violating an individual's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Although a municipality cannot be held liable simply on a theory of *respondeat superior*, *id.* at 691, it can be held liable if a deprivation of a constitutional right is inflicted because of an official policy or custom, *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Municipal liability requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."[3] *Valle v. City*

---

[3] In this circuit, violations of a pretrial detainee's Fourteenth Amendment right to medical care are characterized as either episodic-acts-or-omissions claims or conditions-of-confinement claims. *Sanchez v. Young County (Sanchez I)*, 866 F.3d 274, 279 (5th Cir. 2017) (per curiam). For the latter theory, a plaintiff "must show a condition—a rule, a restriction, an identifiable intended condition or practice, or sufficiently extended or pervasive acts or omissions of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional violation." *Sanchez v. Young County (Sanchez II)*, 956 F.3d 785, 791 (5th Cir. 2020) (quotation omitted). This theory "rests on the idea that the County has imposed what amounts to punishment in advance of trial on pretrial detainees, and it requires no showing of specific intent on the part of the County." *Sanchez I*, 866 F.3d at 279. By contrast, the "episodic acts and omissions" theory "requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs." *Id.* In these cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) (quotation omitted).

A plaintiff can, as Kent does here, invoke these theories in the alternative. *Sanchez I*, 866 F.3d at 279 & n3; *see also* (Dkt. #2 ¶ 309). Collin County does not argue for dismissal of

*of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)). Without an underlying constitutional violation, a municipal-liability claim fails. *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013).

## B. Kent's *Monell* Claim Against Collin County

The Court now turns to whether Kent has sufficiently pleaded the required elements for municipal liability under Section 1983.

### i. Underlying Constitutional Violation

At the outset, Collin County argues that Kent's municipal-liability claim fails as a matter of law because she does not plausibly allege that a county employee violated her constitutional rights. Collin County says that it is shielded from liability because only Wellpath employees—who provided medical care to Kent under the Health Services Agreement—allegedly committed the underlying constitutional violations. The Court disagrees.

Collin County has a duty to provide pretrial detainees adequate medical care. *See Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc). This is true whether Collin County contracts out its health care responsibilities or provides them itself. *See West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody[.]"). As a result,

---

Kent's municipal-liability claim based on the different standards for these alternative theories of liability. Instead, Collin County focuses its argument on the traditional elements required for municipal liability under *Monell*.

Collin "County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012).

It appears that the Fifth Circuit has not expressly adopted this non-delegable duty doctrine in the context of a Section 1983 action. But Collin County does not point to any legal authority, and the Court is aware of none, casting doubt on the doctrine's applicability here. To the contrary, a robust consensus of persuasive authority indicates that, while Wellpath provides the medical care for Collin County's detainees, Collin County remains liable for any constitutional deprivations caused by its policies, practices, or customs. *See id.* ("The underlying rationale is not based on *respondeat superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Although [a private health care provider] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [provider]. In that sense, the county's duty is non-delegable."); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989) (explaining that "the State (and here the County) retains responsibility despite having contracted out the medical care of its prisoners"); *Rodriguez v. S. Health Partners, Inc. (Rodriguez II)*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2, 2020) ("[I]f the court were to ultimately conclude that Navarro County *did* delegate policymaking authority to SHP, such a holding would not of itself preclude Navarro County from also being held liable under § 1983.").

13

As Collin County correctly points out, a municipal-liability claim fails without an underlying constitutional violation. *See Whitley*, 726 F.3d at 648. But Kent has sufficiently pleaded such a violation. She has plausibly alleged that Abii, Atiba, Pounders, and McBride violated her Fourteenth Amendment right to medical care through their deliberate indifference to her serious medical needs.[4] That these individual defendants were employees of a private contractor (Wellpath) does not insulate Collin County from liability if its policy, custom, or practice directly caused the alleged constitutional deprivation. Otherwise, Collin County could avoid liability simply by delegating its constitutional duties to the professional judgment of others, thereby preventing Section 1983 from serving its intended purpose. *Cf. West*, 487 U.S. at 56 n.14; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion) ("If . . . a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.").

At bottom, Collin County cannot absolve itself of liability by using contracted medical care providers at its jail. Regardless of the individual defendants' employment status, Collin County could be held liable if one of its policies or customs was the "moving force" behind the alleged violations of Kent's constitutional right to

---

[4] To be clear, Collin County has not challenged Kent's assertion that Abii, Atiba, Pounders, and McBride were deliberately indifferent to her serious medical needs in violation of her Fourteenth Amendment rights. Its argument as to the lack of an underlying constitutional violation focuses on its own employees and "is unrelated to actions of the [individual defendants]." (Dkt. #36 at 9). Thus, for purposes of this Memorandum Opinion and Order, the Court concludes that Kent has plausibly alleged that the individual defendants were deliberately indifferent to her serious medical needs.

adequate medical care. *See Monell*, 436 U.S. at 694. On the other hand, if a constitutional violation committed by a Wellpath employee did not directly flow from Collin County's policy, custom, or practice, then Collin County would not be liable. Liability for the independent actions of medical personnel at the jail—whether employed by Wellpath or Collin County—would be based on a theory of *respondeat superior* and not actionable against Collin County under Section 1983. Thus, the Court will not dismiss Kent's municipal-liability claim on the ground that Wellpath medical staff, as opposed to Collin County employees, allegedly committed the underlying constitutional violations.

### ii. Official Policy or Custom

As required under *Monell*, the Court next considers whether Kent has plausibly alleged the existence of an official Collin County policy or custom.

A policy's existence "can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Valle*, 613 F.3d at 542 (citing *Burge v. St. Tammany Par.*, 336 F.3d 363, 369 (5th Cir. 2003)). Although a "single decision by a [policymaker] may, under certain circumstances, constitute a policy for which a municipality may be liable," this "single incident exception is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Id.* (cleaned up). A custom is "a persistent, widespread practice of [County] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*,

735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)). A plaintiff's allegations about the policy or custom cannot be conclusory; they must contain specific facts showing the existence of such policy or custom. *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

Here, Collin County argues that Kent has not pleaded enough facts to plausibly allege the existence of an official policy or custom at the jail. Collin County suggests, instead, that Kent complains of a one-time incident for which it cannot be held responsible. The Court is not persuaded.

Kent does more than describe one tragic event. She plausibly alleges that Collin County and Wellpath had a policy—the Cost Containment Program—at the jail of refusing to transfer inmates to offsite medical providers despite the obvious need to do so unless there was a dire emergency. (Dkt. #2 ¶¶ 30–34, 80–83). Collin County allegedly adopted this policy to reduce costs at the jail and save money, despite knowing that doing so would deny inmates necessary medical care and consequently harm them. (Dkt. #2 ¶¶ 333–34). These allegations are not general or conclusory. They are supported by specific facts about Wellpath's proposal of the Cost Containment Program as part of the bidding process for the Health Services Agreement, (Dkt. #2 ¶¶ 25–32, 49–55), Collin County's adoption of the program as an official policy, (Dkt. #2 ¶¶ 80–83), and the implementation of the policy at the jail, (Dkt. #2 ¶¶ 34, 137–41, 164–76, 199–216).

For these reasons, Collin County's reliance on *Rodriguez v. Southern Health Partners, Inc. (Rodriguez I)*, No. 3:20-CV-0045-D, 2020 WL 2928486, at *6 (N.D. Tex.

June 3, 2020), and *Rodriguez II* is misplaced. *Rodriguez* also involved a pretrial detainee who alleged that medical staff at a county jail ignored the obvious signs she was having problems with her pregnancy and refused to transport her to a hospital for treatment, causing her to go into pre-term birth. *Id.* at *2. The plaintiff in *Rodriguez* did not allege that the county "had any official policy that dictated when Jail inmates were permitted to go to the hospital." *Id.* at *5. Rather, she alleged only that "it was [] County . . .  policy at the Jail to refuse to send anyone to the hospital unless there was a manifest emergency—in other words, when the damage was already done" and that "inmates with serious medical conditions . . . are not allowed to seek more advanced care at a hospital." *Id.* (cleaned up). The court concluded that these conclusory allegations were insufficient to establish the existence of an official policy or custom. *Id.*

By contrast, Kent has alleged that Collin County had an official policy that dictated when inmates at the jail were allowed to seek treatment from an outside medical provider. This policy is found in a form Kent signed when she first entered the jail: "True medical emergencies as determined by the medical staff. Note that emergency medical care is defined as 'life or limb threatening illness or injury.'" (Dkt. #2 ¶ 31). So, as Kent alleges, "if the [Wellpath] staff does not determine that the inmate is about to lose their life or limb, then it does not qualify as an emergency medical care situation under [Wellpath's] policy and transport to offsite medical care will be denied." (Dkt. #2 ¶ 32). Kent alleges that this policy of refusing to transport inmates off-site for medical care unless they face a "life or limb threatening" situation

had a name: Cost Containment Program. (Dkt. #2 ¶¶ 29–32, 140–41, 160–62, 175–76, 338). These allegations are sufficiently specific and concrete to plausibly state a policy under *Monell*.

The primary case Kent cites, *Steel v. Alameda County Sheriff's Office*, 428 F.Supp.3d 235 (N.D. Cal. 2019), also supports this conclusion. In *Steel*, a county signed a contract to outsource medical care of its jail detainees to a private company. *Id.* at 239. Based on the terms of this contract, the private company had an incentive to refuse and withhold hospitalization services to inmates, including the plaintiff who was pregnant at the time of her detainment. *Id.* at 239–40. A jail intake form noted the plaintiff's overall condition, lack of prenatal care, recent substance abuse, history of pregnancy-related seizures, UTI diagnosis, and the fact she was not sure about her due date. *Id.* at 239. Medical staff at the jail refused to transport the plaintiff to a hospital when she went into labor, and she allegedly suffered inadequate medical care as a result. *Id.* at 239–40. In denying the county's motion to dismiss, the court determined that its contract with the private medical company established an official policy of denying hospital care to detainees. *Id.* at 242.

Although *Steel* is not binding on this Court, it is persuasive given the similar factual allegations and nearly identical claims at issue here. And like the plaintiff in *Steel*, Kent has plausibly alleged that the contract between Collin County and Wellpath gave rise to an official policy at the jail that caused her inadequate medical care and the death of her unborn child. Collin County does not address these similarities, let alone provide any basis for distinguishing the case. *See* (Dkt. #36

18

at 7). Thus, Kent has satisfied the first element of municipal liability at the Rule 12(b)(6) stage.

### iii. Policymaker

Turning to the second element of *Monell* liability, the Court must determine whether Kent has adequately pleaded that Collin County had final policymaking authority to establish the Cost Containment Program at the jail.

A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Webster*, 735 F.2d at 841. The Fifth Circuit has long distinguished between final decisionmaking authority and final policymaking authority: "discretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Bolton v. City of Dallas*, 541 F.3d 545, 548–49 (5th Cir. 2008) (per curiam) (citations omitted); *see also Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1246 (5th Cir. 1993) ("In *Pembaur* and *Praprotnik* the Court carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority."). Whether an official has "final policymaking authority for purposes of municipal liability is a question of state and local law." *Valle*, 613 F.3d at 542.

In Texas, "sheriffs are 'final policymakers' in the area of law enforcement for the purposes of holding a county liable under Section 1983." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003)). This policymaking authority extends to the provision of medical care at county jails. *See Colle v. Brazos County*, 981 F.2d 237, 244

19

(5th Cir. 1993) (explaining, in a case involving allegedly inadequate medical care, that the "sheriff is without question the county's final policymaker"); *Jackson v. Ford*, 544 F.App'x 268, 272 (5th Cir. 2013) (per curiam) (same).

Here, Kent alleges that Collin County contracted with Wellpath to provide all medical care at the jail. *See, e.g.*, (Dkt. #2 ¶ 50). She also alleges that the Collin County Sheriff approved this contract, was fully aware of its contents, and was directly involved in establishing the medical policies at the jail, including the Cost Containment Program, that were created in conjunction with Wellpath.[5] (Dkt. #2 ¶¶ 313–20). These allegations are sufficient to plausibly allege a policymaker charged with actual or constructive knowledge of the Cost Containment Program. *See Rodriguez*, 2020 WL 2928486, at *6 (reaching the same conclusion based on nearly identical allegations). By plausibly alleging that the Collin County Sheriff was a final policymaker who had actual or constructive knowledge of the Cost Containment Program, Kent has satisfied the second element of municipal liability under *Monell*.

**iv. Moving Force**

Finally, the Court addresses the third *Monell* element: whether Kent has plausibly alleged that Collin County's policy, custom, or practice caused her constitutional deprivation.

---

[5] Kent also alleges that the Collin County Commissioner's Court may also be the policymaker with respect to jail policy. But as the Court explained above, the Collin County Sheriff unquestionably has final policymaking authority over the jail. *See Colle*, 981 F.2d at 244. So the Court need not decide whether the Collin County Commissioner's Court could also serve as the policymaker for purposes of Kent's municipal-liability claim.

To ensure municipal liability does not collapse into *respondeat superior* liability, a plaintiff must show that the official policy, custom, or practice at issue was the "moving force" behind the claimed constitutional violation. *Monell*, 436 U.S. at 694. In other words, the plaintiff must show a direct causal link between the municipal action and the constitutional deprivation. *Piotrowski*, 237 F.3d at 580. The connection must be "more than a mere 'but for' coupling between cause and effect"; the policy must be "the actual cause of the constitutional violation." *Valle*, 613 F.3d at 546 (quotation omitted).

This causation component of municipal liability requires the plaintiff to identify, with particularity, the policies or practices that allegedly caused the constitutional violation. *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018). But precedent does not require a court to "consider each policy or practice in a vacuum." *Id.* It is proper for the court to consider "how individual policies or practices interact with one another within the larger system" and "how the harmful effects of some policies are exacerbated by others." *Id.*

In this case, Kent has plausibly alleged a direct causal link between the Cost Containment Program and the deprivation of her constitutional right to adequate medical care. Kent alleges that this policy of avoiding off-site medical care for inmates until the direst of situations arise—that is, a "life or limb threatening" illness or injury—denied her medical care she obviously needed and caused the avoidable death of her unborn child. (Dkt. #2 ¶¶ 30–34, 330). In other words, Kent alleges that the Cost Containment Program is the reason why she could not seek hospital treatment

that allegedly would have prevented her miscarriage or, at the very least, saved the life of her unborn child.[6]

Kent's allegations are neither speculative nor conclusory. She points to specific instances, including in the days leading up to her miscarriage, in which the individual defendants allegedly refused to transfer her to a hospital based on the Cost Containment Program and the pad-count protocol implemented in furtherance of this policy. (Dkt. #2 ¶¶ 137–41, 164–76, 198–99, 217–25). The factual allegations also support a plausible inference that Collin County and Wellpath had financial incentives to avoid transporting inmates to off-site medical care. (Dkt. #2 ¶¶ 49–67). Indeed, Kent expressly alleges that the denial of necessary off-site medical care to her was imposed to reduce Collin County's costs under the Cost Containment Program. (Dkt. #2 ¶¶ 29, 67, 186, 203, 333, 342).

Taking the allegations as true and viewing them in the light most favorable to Kent, it is plausible that the Cost Containment Program was "the actual cause of the constitutional violation." *See Valle*, 613 F.3d at 546 (quotation omitted). After all, "the law is unwaveringly clear that prolonged vaginal bleeding during pregnancy does constitute a serious medical need, and indeed is 'one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Cooper v.*

---

[6] *See, e.g.*, *Goebert v. Lee County*, No. 204CV505FTM29DNF, 2005 WL 1705485, at *1–2 (M.D. Fla. July 19, 2005) (denying motion to dismiss, treated as a motion for summary judgment, where plaintiff was several months pregnant, requested medical care daily because she was experiencing symptoms that caused her concern for the welfare of her unborn child, and her treating physician informed her that her unborn baby could have been saved "if she had been brought to the hospital without the eleven day delay between the time she first recognized the need for medical attention and the time she was actually admitted").

*Rogers*, No. 2:11-cv-964-MEF, 2012 WL 2050577, at *4 (M.D. Ala. June 6, 2012) (quoting *Goebert v. Lee County*, 510 F.3d 1312, 1326–27 (11th Cir. 2007)); *see also, e.g.*, *Pool v. Sebastian County*, 418 F.3d 934, 944–45 (8th Cir. 2005) (concluding that plaintiff's condition—a few months pregnant, bleeding, and in severe pain from cramping—constituted a serious medical need that would have been obvious to a layperson); *Archer v. Dutcher*, 733 F.2d 14, 16–17 (2d Cir. 1984) (reversing summary judgment against an inmate who allegedly miscarried due to a five-hour delay in responding to her vaginal bleeding after a nurse "informed her that if she was going to miscarry it would happen regardless whether she was in the hospital or the prison").

Attempting to head off this conclusion, Collin County again points to *Rodriguez I* and *Rodriguez II*. The Court agrees that the *Rodriguez* decisions are instructive, just not in the way that Collin County says they are.

In *Rodriguez II*, the court concluded that the plaintiff failed to plausibly allege that the county's policy of not having medical staff on site between 10:00 p.m. and 7:00 a.m. was the moving force behind her alleged constitutional deprivation. 2020 WL 7056336, at *14. The plaintiff alleged that she "would have been transported to the hospital sooner if a *reasonable* nurse or doctor had been physically present at the Jail or if a physician had been on call." *Id.* (cleaned up). The court explained that, "in addition to being a speculative and conclusory assertion, this allegation amounts simply to another way of asserting that the result would have been different had some *other* medical professional—i.e., not [the on-site nurse]—made the decision." *Id.*

Notably, the court added that the plaintiff did not plausibly allege that the on-site nurse was acting pursuant to an official policy when she made that decision. *Id.* For these reasons, the court concluded that the individual decision of the medical care provider, rather than a municipal policy, was the actual cause of the constitutional violation. *Id.*

Here, in contrast, Kent alleges that that her constitutional rights were violated because Abii, Atiba, Pounders, and McBride refused to transport her to a hospital for off-site emergency medical care. And, unlike in *Rodriguez II*, Kent has plausibly alleged that Abii, Atiba, Pounders, and McBride were acting pursuant to and in furtherance of an official policy—the Cost Containment Program—when they did so. (Dkt. #2 ¶¶ 82, 139–146, 154, 161–62, 169–71, 175–77, 184–86, 199, 216, 219–21, 241–42, 247–48). The Court therefore concludes that Kent has sufficiently pleaded that Collin County's Cost Containment Program was the moving force behind the alleged constitutional violations.

* * *

In sum, Kent has adequately pleaded all the elements required under *Monell* to state a plausible Section 1983 claim against Collin County.[7]

---

[7] As noted above, Collin County does not argue for dismissal based on the different standards for the alternative theories of liability that Kent pleads in her complaint: the unconstitutional "conditions of confinement" at the jail and the "episodic acts and omissions" flowing from the Cost Containment Program. (Dkt. #2 ¶ 309). Accordingly, the Court concludes that Kent has stated a plausible *Monell* claim under Section 1983 for both unlawful conditions of confinement and injurious episodic acts and omissions against Collin County. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) (explaining that our adversarial system of adjudication "is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief" (cleaned up)).

## IV. CONCLUSION

For the foregoing reasons, Collin County's Motion to Dismiss, (Dkt. #30), is

**DENIED**.

**So ORDERED and SIGNED this 29th day of March, 2022.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE